Anna M. Dwight et al., Executors, etc., Respondents, *v.* The Germania Life Insurance Company, Appellant.

Where, by the terms of a policy of life insurance, the assured warrants the truth of his answers to questions in his application, compliance with the warranty is a condition of the validity of the contract, and any substantial deviation from the truth in an answer, it is to be assumed, is material to the risk and forfeits the policy.

Where, by plain and unambiguous language in such a policy, the observance of an apparently immaterial requirement is made the condition of a valid contract, neither courts nor juries have the right to disregard it.

Statement of case.

When the construction of a contract depends upon the language of the instrument itself, it is a question of law for the court, and a submission thereof to the jury is error.

In considering the language of an insurance contract, the words of a promise are to be regarded as those of the promisor, while those of a representation upon which the promise is founded are the words of the promisee, and, in either case, are to be taken most strongly against the party using them.

*It seems* that no questions concerning the interpretation of contracts can properly be submitted to a jury, except those arising upon conflicting evidence as to the terms of the contract, or when extrinsic evidence raises some doubt as to the identity of the subject-matter or the claimants thereunder.

The rules relating to the construction of contracts stated.

In an application for a policy of life insurance, after general questions as to the business of the applicant then and for the previous ten years, which were required to be "carefully specified," was contained this question:  "Is he now, or has he been engaged in or connected with the manufacture or sale of any beer, wine or other intoxicating liquors?"  To this question the applicant answered "No!"  By the policy issued upon the application the answers were made warranties.  In an action upon the policy, it appeared that the insured had, for about three years and up to about a year and a half prior to the application, been engaged in the business of keeping a hotel; that, while he had no bar and did not sell to outsiders, he kept a wine and liquor room and regularly and systematically sold wines and liquors in bottles to guests in the house.  In answers to similar questions in applications to other companies, made within three weeks prior to the one in question, the insured stated that he had kept a hotel for three years in which liquor. was sold in packages. *Held*, that the statement was false and so was a breach of warranty and forfeited the policy; also, that it conclusively appeared the insured did not misconceive the meaning and intent of the question.  *Moulor* v. *Am. Life Ins. Co.* (111 U. S. 335), distinguished.

In answer to the question as to his business, the insured answered "Real estate and grain dealer."  There was no evidence that he had been engaged in either kind of business specified, and the answer was negatived by repeated sworn statements to the contrary, made by the insured a short time before the application, and by proof of circumstances of the most convincing character showing his constant employment in other occupations.  *Held*, that while it was true the *onus* of showing the falsity of the statement rested affirmatively upon defendant, the case presented a question of law, and a submission thereof to the jury was error; that while it may be the sworn declarations of the insured did not constitute an estoppel, they constituted evidence of the facts stated and, in the absence of countervailing evidence, became conclusive as to them upon his representatives.

If the proof of a fact is so preponderating that a verdict against it would be set aside by the court as contrary to the evidence, it is the duty of the court to direct a verdict. It is not sufficient to authorize a submission of the fact to the jury that there is a " scintilla of evidence," a mere surmise to the contrary.

(Argued June 18, 1886; decided October 12, 1886.)

APPEAL from judgment of the General Term of the Supreme Court, in the fourth judicial department, entered upon an order made at the January term, 1885, which affirmed a judgment in favor of plaintiffs, entered upon a verdict.

This action was brought by plaintiffs, as executors of the will of Walton Dwight, deceased, upon a policy of insurance issued by defendant upon the life of their testator.

The facts, so far as material to the questions discussed, are stated in the opinion.

*Joseph Larocque* and *William M. Evarts* for appellant. The policy in suit, with the application therefor, together constituted the contract of insurance between Walton Dwight and the defendant. (May on Ins., § 158.) The truth of the answers to the questions contained in the application was warranted by Dwight. (May on Ins., § 156; *Ripley* v. *Ætna F. Ins. Co.*, 30 N. Y. 136, 162; *Foot* v. *Ætna L. Ins. Co.*, 61 id. 571, 576; *Baker* v. *Home L. Ins. Co.*, 64 id. 648; *Barteau, Exr.*, v. *Phœnix L. Ins. Co. of Hartford*, 67 id. 595; *Graham* v. *Fireman's Ins. Co.*, 87 id. 69, 74; *Anderson* v. *Fitzgerald*, 17 Jurist, 995; *Cazenove* v. *Brit. Eq. Ass. Co.*, 5 Jurist [N. S.], 1309; *S. C.* on appeal, 6 id. 826.) It is the peculiar province of a court to construe written instruments, and to declare their legal effect, and the submission of such questions to a jury is error. (*Glacius* v. *Black*, 67 N. Y. 563; *St. Luke's Home, etc.*, v. *Ass'n for Indigent Females*, 52 id. 191; *Arctic Fire Ins. Co.* v. *Austin*, 69 id. 470, 477; *Nash* v. *Drisco*, 51 Me. 417; *Roth* v. *Miller*, 15 S. & R. 100; *Shepherd* v. *White*, 11 Texas, 346; *Drew* v. *Towle*, 30 N. H. 531; *Thomas, Exr.*, v. *Thomas*, 15 Monr. [Ky.] 178; *Perth Amboy Manuf. Co.* v. *Condit*, 21 N. J. L. 659; *Brown's*

*Admrs.* v. *Hatton*, 9 Ired. [N. C.] 319 ; *Williams* v. *Waters*, 36 Ga. 454 ; *Levy* v. *Gadsby*, 3 Cranch, 180 ; *Welsh, Admr.*, v. *Dusar*, 3 Binn. 337 ; *Dennison's Exrs.* v. *Wertz*, 7 S. & R. 373, 376 ; *Short* v. *Woodward*, 13 Gray, 86 ; *Rhodes* v. *Chesson*, Busb. L. [N. C.] 336 ; *Smalley* v. *Hendrickson*, 29 N. J. L. 371 ; *Lomer* v. *Meeker*, 25 N. Y. 361, 362.)    The answer of the insured to the question in his application as to application for other insurance, being mutual, was a breach of warranty, and avoided the policy. (*Traill* v. *Baring*, 4 DeG., J. & S. 329 ; *Edington* v. *Ætna L. Ins. Co.*, 77 N. Y. 564, 571 ; 100 id. 536.)    The defendant was entitled to a dismissal of the complaint. (*Deyo* v. *N. Y. C. R. R. Co.*, 34 N. Y. 9 ; *Improvement Co.* v. *Munson*, 14 Wall. 442 ; *Pratt* v. *Hull*, 13 Johns. 334 ; *Labar* v. *Koplin*, 4 N. Y. 547 ; *People* v. *Cook*, 8 id. 67, 75 ; *Millbank* v. *Dennistoun*, 21 id. 386 ; *Burke* v. *Witherbee*, 98 id. 562 ; *Lomer* v. *Meeker*, 25 id. 361.)    Knowledge of the agent of the company of the falsity of the warranty would not relieve the insured, or his representatives, from the consequence of a breach. (*Barteau* v. *Phœnix Mut. Ins. Co. of Hartford*, 67 N. Y. 595 ; *Chase* v. *Hamilton*, 20 id. 52 ; *Ripley* v. *Ætna Ins. Co.*, 30 id. 136 ; *Brown* v. *Cattaraugus Mut. Ins. Co.*, 18 id. 387 ; *Fort* v. *Ætna L. Ins. Co.*, 61 id. 571 ; *Mowry* v. *Rosendale*, 74 id. 360.)    In an action for fraud it is not necessary for the plaintiff to prove all the allegations of his declaration as to the means used by the defendant in doing the act complained of, or the manner of carrying it out, provided less than all are sufficient to constitute a cause of action, and what are sufficient are proved. (Bigelow on Fraud, 493 ; *Fleming* v. *Slocum*, 18 Johns. 403 ; *Tomlin's Admrs.* v. *Den*, 19 N. J. L. 76 ; Bliss on Ins. 270, § 177 ; *Home Ins. Co.* v. *Stanchfield*, 1 Dill. 424.)

*Isaac S. Newton* for respondents. It is not clear that the intent of the parties to the policy contract was to make the exact truth of Dwight's statements a condition precedent to its validity. This is necessary before plaintiffs can be held to the rule of a rigid warranty. (*Moulor* v. *Ins. Co.*, 111 U. S.

335; *Conn. Mut. Ins. Co.* v. *Union Trust Co.*, 112 id. 250, 257, 258; *Home Life Ins. Co.* v. *Gillespie*, 15 Ins. L. J. 390; *Peas-ley* v. *Ins. Co.*, 15 Hun, 227; Bliss on Ins., § 55, [2d ed.]; May on Ins., §§ 164, 175 [1st ed.]; *Price* v. *Ins. Co.*, 17 Minn. 497; 10 Am. Rep. 166; *Burleigh* v. *Ins. Co.*, 90 N. Y. 220; *Grattun* v. *Ins. Co.*, 92 id. 280, 281; *Cushman* v. *Ins. Co.*, 70 id. 72; *Titus* v. *Ins. Co.*, 81 id. 411, 420, 421; *Ins. Co.* v. *Rud-wig*, 11 Ins. L. J. 603; *Van Valkenburgh* v. *Am. Pop. L. Ins. Co.*, 70 N. Y. 605; *Fitch* v. *Ins. Co.*, 59 id. 557; May on Ins., § 164.) Words in applications for insurance are to be construed, not in a technical, but in the general, ordinary and usual way. (May on Ins., § 175.) A warranty of that which will tend to prevent a contract will not invalidiate it, unless at least it is so plainly expressed as to leave no other possible construction. (*Germania Ins. Co.* v. *Rudwig*, 80 Ky. 223; *Moulor* v. *Ins. Co.*, 111 U. S. 335; *Burleigh Ins. Co.*, 90 N. Y. 220; *Home Life Ins. Co.* v. *Gillespie*, 15 Ins. L. J. 390.) If a question is susceptible of being answered in more than one way and differently from different points of view, it will not be open to the company which proposes the question, to object that it is not answered in the true sense. (*Peasley* v. *Ins. Co.*, 15 Hun, 228, 229; May on Ins., §§ 175, 176; *Griffey* v. *Ins. Co.*, 100 N. Y. 417.) The fact that defendant knew all about other applications pending, or at least had sufficient notice to put it on inquiry, purges a wrong answer, even if warranted, of its vice. (*Bennett* v. *Buchan*, 76 N. Y. 386.; *Woodward* v. *Ins. Co.*, 32 Hun, 371; *Myers* v. *Ins. Co.*, 99 N. Y. 11; *Adams* v. *Mills*, 60 id. 539; *Cragie* v. *Hadley*, 99 id. 131, 134; *Couch* v. *Ins. Co.*, 25 Hun, 469; *Fowle* v. *Ins. Co.*, 20 Week. Dig. 55, 56; *Van Schoick* v. *Ins. Co.*, 68 N. Y. 434.) The mere fact that Dwight said at one time or many, that liquors were sold in packages, does not establish affirmatively and conclusively, that the transaction was a sale within the ordinary acceptation of the word. (*Mich. Carbon Works* v. *Schad*, 38 Hun, 71, 75; *Stephens* v *Vrooman*, 18 Barr, 250; 2 Wait's L. & Pr. 381; 1 Greenl. on Ev., § 201.) The question as to the truth of Dwight's answer to the inquiry in the application as to his occupation was

a mixed question of law and fact, and hence belonged to the jury. (3 Wait's Pr. 172, 174.) This question only calls for such an engagement in, or connection with a sale, etc., as increases the insurable risk. (*Burleigh* v. *Gebhard F. Ins. Co.*, 90 N. Y. 220.; *Home Life Ins. Co.* v. *Gillespie*, 15 Ins. L. J. 390.)

RUGER, Ch. J.    At the close of the evidence on the trial the defendant moved for a dismissal of the complaint upon the ground, among others, that the uncontradicted evidence showed that the answers made by the assured, to certain questions in the application for insurance were false and untrue, and constituted a breach of warranty which avoided the contract.    The trial court denied the motion and the defendant excepted.    A further motion was then made for the direction of a verdict in favor of the defendant upon the same grounds, which was also denied by the court, and an exception taken thereto.

The main question discussed arises over the validity of these exceptions.    It was assumed both by the trial court and by the General Term that by the terms of the policy the assured warranted the truth of the several answers referred to, and that, therefore, compliance with such warranty was a condition of the validity of the contract of insurance.    This determination of the courts below was properly acquiesced in by the counsel for the respondents upon the argument before us, as it could not have been successfully questioned.

It must, therefore, be assumed in the further consideration of this case, that any substantial deviation from the truth in the answers so given, was material to the risk, and constituted a breach of the terms of the contract, rendering the policy based upon such answers void. (*Armour* v. *Transatlantic Fire Ins. Co.*, 90 N. Y. 450.)

Parties to an insurance contract have the right to insert such lawful stipulations and conditions therein, as they may mutually agree upon, or which they may consider necessary and proper to protect their interests, and which, when made,

must be construed and enforced like all other contracts according to the expressed understanding and intent of the parties making them. If an insurance policy in plain and unambiguous language makes the observance of an apparently immaterial requirement, the condition of a valid contract, neither courts nor juries have the right to disregard it or to construct, by implication or otherwise, a new contract in the place of that deliberately made by the parties. (*Appleby* v. *Astor Fire Ins. Co.*, 54 N. Y. 253 ; *Foot* v. *Ætna Ins. Co.*, 61 id. 571 ; *Graham* v. *Firemans' Ins. Co.*, 87 id. 69 ; *Armour* v. *Transatlantic Fire Ins. Co., supra.*)

Such contracts are open to construction like all other contracts needing interpretation, but are subject to it only when upon the face of the instrument it appears that its meaning is doubtful or its language ambiguous or uncertain. (May on Ins., § 172.) An elementary writer says : " Indeed the very idea and purpose of construction imply a previous uncertainty as to the meaning of a contract, for when this is clear and unambiguous there is no room for construction and nothing for construction to do." (2 Pars. on Cont. 500.) The same author says : " That courts cannot adopt a construction of any legal instrument which shall do violence to the rules of language or the rules of law," and quotes the language of Lord Chief Baron EYRE in *Gibson* v. *Minet* (1 H. Bl. 569), that "all latitude of construction must submit to this restriction, namely, that the words may have the sense which by construction is put upon them." (Id. 494.) In *Parkhurst* v. *Smith* (Willes, 332) WILLES, J., says : " I admit that though the intent of the parties be never so clear it cannot take place contrary to the rules of law, nor can we put words in a deed which are not there, nor put a construction on the words of a deed directly contrary to the plain sense of them." Addison on Contracts (p. 165), lays down the rule that " the judgment of the court in expounding a deed must be simply declaratory of what is in the deed. It has to ascertain, not what the party intended, as contra-distinguished from what the words express, but what is the meaning of the words he has used," and " when the words of any written

instrument are free from any ambiguity in themselves, and where external circumstances do not create any doubt or difficulty as to the proper application of those words to claimants under the instrument, or to the subject-matter to which the instrument relates, such instrument is always to be construed according to the strict plain and common meaning of the words themselves, and evidence *dehors* the instrument, for the purpose of explaining it according to the surmised or alleged intention of the parties, is utterly inadmissible." (*Shore* v. *Wilson*, 9 Cl. & Fin. 565.)

In considering the language of an insurance contract, the words of a promise are to be regarded as those of the promisor while those of a representation upon which the promise is founded are the words of the promisee, and are to be taken most strongly against the party using them. (May on Ins., § 175.) In view of the fact that these principles have been plainly disregarded by the courts below, we have thought it proper to refer more extensively to elementary authors than would otherwise have been deemed necessary. Their application will be seen by an examination of the situation of the case at the time the objectionable rulings were made.

Among the facts which the defendant deemed it important to know before entering into a contract of insurance with the deceased, was his previous business and occupation. The materiality of truthful information in relation thereto was impressed upon the applicant by specific inquiries, and the requirement that truthful answers thereto should be made the condition of a valid contract. With the view of eliciting the information desired a series of questions was proposed to the deceased embracing not only an inquiry as to his general business and occupation, but special inquiries as to certain particular trades and employments. Among those which we deem it important to refer to in this case were the following :

" A. For the party whose life is proposed to be assured, state the business carefully specified ?" Ans. " Real estate and grain dealer." " B. Is this business his own or does he work for other persons and in what capacity ?" Ans. " His own."

" C. In-what occupation has he been engaged during the last ten years?" Ans. " Real estate and grain dealer." " D. Is he now, or has he been engaged in or connected with the manufacture or sale of any beer, wine or other intoxicating liquors?" Ans. " No."

An application dated August 28, 1878, containing the questions and answers stated, was signed by Walton Dwight in his character of an applicant for insurance, and also in that of the assured, and was delivered by him to the defendant. In pursuance of the request contained therein, the defendant, on August 28, 1878, delivered to the applicant the policy in suit, containing among others these provisions: " This policy is issued, and the same is accepted by the said assured upon the following express conditions and agreements: That the same shall cease and be null and void and of no effect     *     *· *     *     if the representations made in the application for this policy, upon the faith of which this contract is made, shall be found in any respect untrue."

Dwight died November 15, 1878, immediately before the payment of a second quarterly premium became due; and·this action was commenced in April, 1879, about seven months after the delivery of the policy.

Upon the trial it appeared that Dwight was engaged in the business of keeping hotel in Binghamton from May, 1874, until March, 1877, and that during that period he regularly and systematically sold wines and liquors in bottles of various sizes, bearing the name of his hotel blown into the glass, to such of his guests as desired them. He kept a wine or liquor room in which was stored a large supply of wines and liquors, and each year while so engaged he applied, paid for and received from the representatives of both the State and National governments licenses and permits authorizing him to carry on the business of selling beer, wine and liquors at retail to be drank upon his premises. It also appeared that he kept no bar and did not sell to persons who were not his guests. These facts were undisputed. Their absolute truth was assumed by the trial judge in charging the jury, and by the General Term

in passing upon the appeal to that court. That the answer given by Dwight to the question relating to the sale of liquor was incorrect was admitted by both tribunals. That Dwight did not misconceive the meaning and intent of the question conclusively appeared from repeated answers made by him to other companies, within three weeks prior to this time, to similar questions in applications for insurance in which he stated that he had kept a hotel for three years in which liquor was sold in packages.

Upon denying the motion for a nonsuit the trial court refused to pass upon the question as to whether the facts constituted a breach of warranty or not, but left it to the jury to say whether the sales of liquor proved to have been made were sales at all, within the intent and meaning of the contract. In this we think that the court erred, no question arising upon the evidence which authorized its reference to the jury. If there was any room for doubt in respect to the true meaning and intent of the inquiry answered by the deceased, it presented a question of law for the court to determine, and not one for the jury. (*Lomer* v. *Meeker*, 25 N. Y. 361; *Glacius* v. *Black*, 67 id. 563.) But we are of the opinion that no such doubt existed in the case.

The contract was in writing subscribed by the parties, and they expressed their agreement in clear, unambiguous and intelligible language. Its import and meaning was not obscured by reference to the situation and circumstances, surrounding the transaction, or by the consideration of other parts of the same instrument. On the contrary an examination of the context and associated questions make more certain and definite its object and intent. The assured had been previously interrogated as to his general business and employment, and it is to be assumed had given such answers in respect thereto, as satisfied the object of the inquirer. He was then specially requested to state whether he was then, or had been, engaged in or *connected* with the manufacture or sale of *any* beer, wine, or other intoxicating liquors. The information called for was made material, not only by the express agreement of the par-

ties, but also by the object for which it was required, plainly apparent from the nature of the transaction.

The question called for no opinion, and was capable of a precise, definite and categorical answer. It was intentionally framed in broad and comprehensive terms apparently to avoid any evasion of its object; but was, nevertheless, expressed in clear and unambiguous language. If an intention to inquire concerning the conduct of the regular or principal business of the assured could be implied from the use of the word "engaged," an idea that such was the only meaning of the question was negatived by the further words " or *connected* with the manufacture or sale of *any* beer," etc., which pointed unmistakably to every transaction of the kind described, however limited its character, or remote his connection with it, might have been.

The motive prompting the question was reasonable, natural and proper, and apparent even to the most careless reader. The inquiry could not have referred to the general business employment of the insured, because inquiries on that subject had previously been exhausted, and the question had no office to perform in that respect. It carried upon its face the object which the insurer had in asking it, and required an answer as to whether the applicant was, or had been, engaged in or connected with the manufacture or sale of liquors, etc., not in a limited or restricted capacity or employment, but in any and every way in which such acts could have been performed.

The question itself assumes that persons engaged in or connected with the manufacture or sale of liquors in any manner were more hazardous subjects for insurance than those occupied in more reputable employments, and that the insurer would regard such employment as an objection to the proposed contract.

The extent to which the employment affected the character of the applicant, or his value as a risk, was a question solely for the insurer. The defendant had a right to a full and frank disclosure of any and all facts bearing upon the subject, and this confessedly it did not obtain. It was misinformed as to the precise fact which had been agreed upon as material

for it to know, in determining the propriety of entering into the proposed contract, and by the party who had assented to the proposition, that such information should invalidate any contract made.

If the fair import of the language used, indicates that the interrogatory intended to include within its scope and meaning single transactions or incidental occupations, neither courts nor juries have authority to say that such transactions may properly be disregarded in the answer made. The defendant must be deemed to have meant what it said, and its express language embraces all transactions, and its express contract has made every transaction of the kind referred to material to the risk.

The legal effect of this contract can be avoided only by making a new one for the parties, or denying any significance to language. We are unable to see any ground upon which the ruling of the trial court can be supported. The case of *Moulor* v. *Am. Life Ins. Co.* (111 U. S. 335) has been cited as tending to support the ruling. The question there arose under an exception to so much of the charge of the trial judge, as stated that if the answers to certain questions in the application under consideration were untrue, the policy was void, whether the assured knew them to be so or not. The court held that a consideration of the language of the whole policy rendered it doubtful whether it was intended to warrant the absolute truth of the answers in question, without regard to the good faith of the assured in making them, and, therefore, held as a question of law that the instructions were erroneous and the exception well taken. This decision undoubtedly accords with the well-settled doctrine on the subject, but is not an authority upon the question here presented. (See *Armour* v. *Transatlantic Fire Ins. Co., supra.*)

When the terms and language of a contract are ascertained its meaning and intent present questions of law only, and it is the duty of the court and not of the jury to determine and declare what that is. Parsons on Contracts (vol. 2, p. 492) says, that the first rule in the construction of contracts is, "that what a contract means is a question of law. It is the

court, therefore, that determines the construction of a contract. If any one contract is properly construed justice is done to the parties directly interested therein. , But the rectitude, consistency and uniformity of all construction enables all parties to do justice to themselves. For then all parties, before they enter into contracts or make or accept instruments, may know the force and effect of the words they employ, of the precautions they use, and of the provisions which they make in their own behalf, or permit to be made by others. It is obvious that this consistency and uniformity of construction can exist only so far as construction is governed by fixed principles, or in other words is matter of law, and here arises the very first rule." This principle has been repeatedly approved and uniformly acted upon in the decisions of this court (*Groat* v. *Gile*, 51 N. Y. 431; *St. Luke's Home* v. *Association, etc.*, 52 id. 191; *Glacius* v. *Black*, 67 id. 563; *Arctic Fire Ins. Co.* v. *Austin*, 69 id. 470), and is the uniform doctrine of the cases and text-books. (*Levy* v. *Godsby*, 3 Cranch, 180; *Short* v. *Woodward*, 13 Gray, 86; *Smalley* v. *Hendrickson*, 29 N. J. L. 371; *Dennison's Exrs.* v. *Wertz*, 7 S. & R. 373; *Welsh, Admr.*, v. *Dusar*, 3 Binn. 329; 2 Pars. on Cont. 492; Add. on Cont. 165, etc.)

It would seem from the authorities hereinbefore referred to that no questions affecting the interpretation of contracts can properly be submitted to a jury except those arising upon conflicting evidence as to the terms of the agreement, or where extrinsic evidence raises some doubt over the identity of the subject-matter, or of the claimants thereunder. (Add. on Cont. 165.)

Instead of following the plain rule laid down in the authorities cited, the trial court assumed the existence of an ambiguity and referred the legal questions involved in the construction, of the contract to the jury for their speculations. The logical effect of such a disposition was a rule that contracts expressed in the same language and executed under the same circumstances might legally be held valid in one locality and invalid in another, according to the capricious and

often conflicting opinions of juries.  The theory upon which the trial court submitted the case to the jury is implied from the circumstances pointed out in the charge for their consideration.  Its attention was directed to the fact that Dwight kept no bar, and did not sell liquor to people generally, but only to his guests, and as an incident to the business of keeping a hotel, and from these facts it was impliedly advised, that it was authorized to find upon this question, for the plaintiff.  In other words, the jury was instructed that because the assured had not been engaged in or connected with the manufacture or sale of liquor, etc., in a particular way, that he could truthfully represent that he had not been connected with it in any way, and if he did not sell to everybody without limitation or exception, that he was justified in saying that he did not sell to any one.  The fallacy of such a charge is too plain for argument.

The defendant was further prejudiced before the jury by the reference in the charge to the claim made by the plaintiff that the question was incapable of a truthful affirmative or negative answer, for it was said if he had answered it affirmatively, it would have been an admission of his connection with the manufacture of liquor, which concededly was not true, and it was implied therefrom that his only safe answer was a negative one.  This circumstance was pointed out to the jury as having a bearing upon the question, and it was impliedly authorized to find that the question was equivocal, because not capable of a direct and positive answer.  The reference was obviously misleading and erroneous, for the interrogatory being in the alternative, could truthfully have been answered in the negative only in case the assured had been engaged in neither of the occupations referred to, and would have been answered truthfully in the affirmative, if he had been connected with either.

This error was further aggravated by the refusal of the court, upon request, to charge that the question could be truthfully answered in the affirmative if he had been connected with the sale of liquor.  This refusal was clearly erroneous, and the exception taken thereto was well taken.

We are, for the reasons stated, of the opinion that upon this branch the case presented no question for the jury, and the court erred in denying the motion for a nonsuit. (*Loomer* v. *Meeker*, 25 N. Y. 361 ; *Appleby* v. *Astor Fire Ins. Co., supra ; Glacius* v. *Black, supra.*)

We are also of the opinion that the answers of the assured to the questions relating to his business and occupation, were evasive and untrue, and upon the whole evidence required the dismissal of the complaint. There was not only an absence of satisfactory evidence in the case that he had ever been engaged in the business of a real estate or grain dealer, for himself in the ordinary acceptation of those terms, but such an occupation was negatived by his repeated sworn declarations to the contrary, and the proof of circumstances of the most convincing character. The evidence upon these questions is substantially all to the same effect, and presents a case so preponderating in character that a verdict against it could not be allowed to stand. The case, therefore, presented a question of law as to whether the business engaged in by the deceased constituted him a dealer in real estate and grain, within the ordinary meaning of those terms.

Undoubtedly 'the *onus* of showing the falsity of the representations made by Dwight in respect to his business and occupation rested affirmatively upon the defendant, but when it had produced his sworn declarations, made but a few months previous to the representations, expressly negativing their truth, and the story of his life had been testified to, showing his constant employment in other occupations, it had overcome the presumption of truth existing in favor of the representations and made a case calling for affirmative evidence to overthrow it. The plaintiffs, although surrounded during the trial with relatives and friends of Dwight, who were acquainted with his history and appeared as witnesses, and detailed his former occupation and employment, gave no such evidence. There is not a scintilla of direct evidence that Dwight had ever been in business as a grain dealer, and the circumstances of his life as disclosed by the proof show that he could not have been so

employed. He had never resided at Chicago, the alleged theatre of his dealings in grain, and had never been there except for a short period in the spring and summer of 1878, during which he was a bankrupt, hopelessly in debt and precluded, much of the time, by sickness from engaging in any business. The plaintiffs did not produce the slightest proof of any such occupation, and the only evidence referring to it was Dwight's statement, made in a gasconading manner, to one of the defendant's witnesses in June, 1878, and incidentally appearing in evidence, in which he said "that he had been to Chicago and just returned; that he went there to make some money and went into partnership with a couple of brothers, who had money but no experience, and he had experience but no money, and he wanted to operate in grain. In two transactions he cleared $30,000, and was taken sick, and his partners thought he made money so easy they could do the same, and while he was sick they in their operations lost the $30,000 he had made, so that left him without a dollar." This declaration was obviously not made to inform any one as to his business, but apparently with the object of exalting his own sagacity and shrewdness, and if it could be considered as any evidence of his calling, was of the most inconclusive character, and showed that the business, whatever it was, had been abandoned in June, 1878, and never after resumed. It falls far short of being sufficient to authorize the finding of a jury that he was a grain dealer, or that he was on the 22d of August, 1878, and for ten years previous thereto had been such dealer.

There is no evidence that during the ten years previous to the application, Dwight owned, bought, sold or dealt in real estate. It did appear that, at some period of his life, he had owned scattered parcels of wild land in three or four different States; but previous to the ten years referred to in the inquiry he had caused this property, so far as it had any appreciable value, to be conveyed to his wife, and it was thereafter owned by her and generally employed as security for borrowing money upon, presumably for the purposes of its improvement. The evidence given to establish the falsity of the representations in

question consisted largely of the sworn statements of Dwight, made between December, 1877, and March, 1878, in bankruptcy proceedings, in which he testified, among other things, "I think I opened the Dwight House in May, 1874. I furnished part of it then and ran it partly as a hotel, and rented part of it in the spring of 1875." "The only business I had was the Dwight House business and livery. The other business was my wife's business, although I had always kept it as my own account." "I kept no open bar; liquors were sold in packages. I should think I had some two or three thousand dollars worth of those when I opened the house, the stock was larger then than at any time afterward; that included cigars. I took out of my private house some six or seven hundred dollars worth of liquors that were not invoiced. I kept wines, liquors and cigars all through my business." "I say the Dwight House was the only business I had as a regular business." Q. "When did the Dwight House open?" A. "It opened in 1874; the 26th of May, I think." Q. "And closed when?" A. "It closed the 8th day of March, 1877." Q. "I understand you made your settlement on your wife about when?" A. "It was done in the latter part of June or July, 1868." Q. "From that time down to the time of the commencement of the Dwight House business, had you any business of your own?" A. "I had not; not further than my lawsuits; general living and the like of that. I had no business of my own." In addition to this explicit evidence of the untruthfulness of his representations, it appears from an examination of the applications made by him for insurance during the month of August, 1878, that his representations, as to his business and occupation, were quite contradictory and misleading.

On July 31, 1878, in his first application, he describes himself as a general dealer in grain and produce, and his place of business as being mostly in Chicago. In subsequent applications he quite uniformly describes himself as a real estate and grain dealer, but occasionally varies the description by statements that "it was formerly real estate." "Real estate and grain dealer always." "Formerly same, speculator, army, hotel-

keeper." "Formerly same as now." "Real estate and grain dealer always." "Real estate and grain dealer always, no change in occupation or employment." "Always been dealer in real estate and grain." It is quite impossible to reconcile these various statements with each other, or with the established facts of the case.

The history of his life, as related by himself, shows that from 1868 to 1878 the only business or occupation, pursued by him in his own name was that of a hotel-keeper. All allusion to this business is suppressed in the application in question. From 1868 to 1874 he was engaged in building upon and improving about thirteen acres of land in Binghamton, and if this afforded any justification for his description of business as a real estate dealer, the conceded ownership of such property by his wife, rendered the declaration that such business was "his own" untrue.

The trial court, in charging the jury, stated that Dwight's sworn declarations as to his business and occupation did not constitute an estoppel against the plaintiffs as to the truth of such statements. This may be admitted without invalidating their force as evidence of the facts stated. They did constitute evidence of such facts, and in the absence of countervailing evidence, became conclusive upon Dwight's representatives as to such facts.

It is quite clear that these answers gave no information as to the actual employment and business of Dwight to the defendant, and would have been quite as correct and satisfactory if he had represented himself to be a geologist or professor of elocution.

We think it was clearly the duty of the trial court upon this evidence to have directed a verdict for the defendant.

It is claimed by the plaintiffs that if there is a scintilla of evidence in support of a proposition, or if the evidence against it does not amount to a demonstration, that a question is raised which must be left to the jury. We do not so understand the rule. If the proof of a fact is so preponderating that a verdict against it would be set aside by the court

as contrary to the evidence, then it is the duty of the court to direct a verdict. (*People* v. *Cook*, 8 N. Y. 67 ; *Wilds* v. *H. R. R. R. Co.*, 24 id. 430, 433 ; *Appleby* v. *Astor Ins. Co.*, *supra* ; *Kelsey* v. *Northern Light Oil Co.*, 45 N. Y. 509 ; *Cagger* v. *Lansing*, 64 id. 417, 427 ; *Neuendorff* v. *World Mut. Ins. Co.*, 69 id. 389, 392.) It was said in *Baulec* v. *N. Y. & Harlem R. R. Co.* (59 N. Y. 356, 366), by Judge Allen, that " it is not enough to authorize the submission of a question as one of fact to the jury that there is ' some evidence.' A scintilla of evidence or a mere surmise, that there may have been negligence on the part of the defendants would not justify the judge in leaving the case to the jury," quoting from Williams, J., in *Toomey* v. *Railway Co.* (3 C. B. [N. S.] 146). (See *Culhane* v. *N. Y. Cent., etc., R. R. Co.*, 60 N. Y. 133, 136 ; *McKeever* v. *N. Y. Cent., etc., R. R. Co.*, 88 id. 667.) In *Hyatt* v. *Johnson* (91 Penn. St. 200), Justice Sharrett says : " Since the scintilla doctrine has been exploded both in England and in this country, the preliminary question of law for the court is, not whether there is literally no evidence, or a mere scintilla, but whether there is any that ought reasonably to satisfy the jury that the fact sought to be proved is established," citing *Ryder* v. *Wombwell* (L. R., 4 Exch. 39). The rule held by the Supreme Court of the United States is expressed by Mr. Justice Clifford in *Improvement Co.* v. *Munson* (14 Wall. 442), as follows : " Nor are judges any longer required to submit a question to a jury merely because some evidence has been introduced by the party having the burden of proof, unless the evidence be of such a character that it would warrant the jury in finding a verdict in favor of that party. Formerly it was held that if there was what was called a scintilla of evidence in support of a case, the judge was bound to leave it to the jury ; but recent decisions of high authority have established a more reasonable rule, that in every case, before the evidence is left to the jury, there is a preliminary question for the judge, not whether there is literally no evidence, but whether there is any upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the onus of proof rests."

To the same effect are *Pleasants* v. *Fant* (22 Wall. 120); *Commissioners, etc.,* v. *Clark* (94 U. S. 284); *Griggs* v. *Houston* (104 U. S. 553); *Bailey* v. *Cleveland Rolling Mill* (21 Fed. Rep'r, 159); *Witherbee* v. *Wasson* (71 N. C. 451). We think this a case where the conclusive character of the proof required the application of the rule, and that the court should have intervened to prevent a verdict upon evidence so insufficient to support it.

Many other questions arose under the various defenses presented upon the trial which would, if it were necessary to the decision of this appeal, be instructive and interesting to examine and discuss; but in the view we have taken it would be a work of supererogation to do so.

The questions arising over the defense that the whole scheme of insurance conceived by Dwight originated in a design to cheat and defraud the insurers; and the further allegation that Dwight's answer to the question, whether he ever had the disease of spitting blood, are among the most prominent of those presented upon the argument.

The circumstances of the case are quite extraordinary and unnatural, and might well give rise to various and conflicting theories and conjectures in the effort to account for its strange and abnormal features; but in view of the fact that a new trial must be ordered upon other grounds, it would serve no useful purpose to attempt to determine the questions raised thereby.

The judgments of the courts below are, therefore, reversed, and a new trial ordered, with costs to abide the event.

All concur, except DANFORTH, J., dissenting, MILLER, J., not voting, and FINCH, J., taking no part.

Judgment reversed.