Alexander Del Gtxorno, J.
On or about September 20, 1960, claimant entered into a contract with the State of New York, acting by and through the Taconic State Park Commission, for the construction, reconstruction and improvement of certain portions of Mohansic State Park, Westchester County, affecting site preparation, recreation facilities, utilities, ground improvements, appurtenant work, excavation and grading, etc.
Said contract was to commence promptly and be completed by June 1, 1961. The contract was actually acknowledged by the commission to be completed in all details on January 17, 1962, whereas the claimant states it was completed about November 1, 1961 and accepted by the State on November 6, 1961.
The final estimate submitted by the Conservation Department on January 17, 1962 indicated that $32,381.26 was concededly due to the claimant, for which a check was sent. The claimant rejected the check forwarded on the ground that the claimant disagreed with the State as to the amount then due to it.
*487 On February 2,1962, the claimant filed a claim for $61,378.26 in which was included the $32,381.26 as part of its damages.
Thereafter, in a severance action, the late Judge Major, by judgment dated February 13, 1962, ordered the $32,381.26 paid to the claimant, reserving the question of interest thereon until the final determination by this court.
The trial clearly pointed out the cumbersome system under which public contracts are entered into as well as carried out, which involve too many documents to refer to (especially the Department of Public Works general specifications), which documents in turn are modified by the contract itself or plans, or additional specifications inserted in the contract. This potpourri of diverse ingredients hardly ever jells and so often leads to multifarious misunderstandings, bickerings and actual stoppages, resulting in claims which must be finally determined by this court. The parties herein frankly conceded that most of the misunderstandings of the terms of the contract and disagreements which affected the carrying out of said terms would be resolved for one side or the other, depending upon what interpretation or construction the court would come up with at the end of the trial.
Weyrauch, Richardson on Contracts (p. 269): £< To establish the nature and effect of contract obligations, modern courts apply rules of construction and interpretation to agreements brought before them for adjudication. Interpretation consists of an evaluation of words and a decision as to their meaning. Construction is broader. It embraces a determination of the thoughts and intentions of the parties as gathered from the entire course of their dealings. The judicial objective is to get a view of the contract as a whole, in the light of all of its constituent parts, and then to apply it in the terms of public policy. See Corbin, Conditions in the Law of Contracts, 28 Yale L. J. 739; cf. Restatement, Contracts, Chap. 9, Topic 1.”
The disputed issues arising from the contract were the cause of bickering and no little confusion, even at the trial. As one hears so often when faced with a complex state of affairs, £ 1 There ought to be an easier way of running this railroad. ’ ’ To arrive at a satisfactory conclusion, some analysis and references to the contract are necessary. When, as in this case, the commission embodies by reference in the contract the specifications of the Department of Public Works which consist of a printed volume of almost 500 pages, and upon which it intends to place major reliance, it should not insert upon its plans any partial excerpts of any of its provisions affecting any item of the contract but, rather, should either refer to the appropriate *488 subdivision of the said specifications or quote it in full on the plans or, with good grace and to avoid litigation, should accept its own modification of the contract which, being specific, evidences the positive intent of the parties and takes precedence over the general specifications. (Young Fehlhaber Pile Co. v. State of New York, 265 App. Div. 61.)
In this case it seems to the court that the commission’s representatives want to eat their cake and keep it, too. What is the claimant to do when in the contract the State incorporates by reference all the aforesaid specifications of the Department of Public Works but, in the same contract, it sets forth: “ All materials to be furnished and all work to be performed under items of .the State specifications will be covered by and shall be in conformity with Parts II, III and IV of the State specifications, except those items that are otherwise modified on the plans or in this section.”
What does the State expect of the contractor when the plans modify the Department of Public Works specifications by eliminating the important last portion of the provision regarding unsuitable materials and rely only on the first sentence thereof, which states: “ Unsuitable materials shall be used for flattening embankment slopes and where otherwise directed by the engineer”. This habit of preparing important public contracts can only result in uncertainty as to the precise nature of the obligations incurred thereunder.
As a result of the above and other admixtures of intent to be referred to hereafter, the representatives of both sides on the job hardly agreed on the manner of carrying out any item of the work. For example, the contract provides “ woke ” in the penalty clause of the contract. The defendants’ engineering consultant advised the claimant after certain delays that it would be charged engineering charges, and it was — the sum of $6,213 was arbitrarily deducted without even a discussion as to its exactness, much less its justification. The State was wrong twice, the first time when it inserted “ none ” in the contract, and the second time, when it deducted the engineering charges. (10 N. Y. Jur., Contracts, § 205.)
The contract also provides that the staking out of the utility pole lines shall be made by the New York State Electric and Glas Company, shall conform to its standards and be acceptable .to it as well as the engineer. It was staked out by the responsible engineer of the electric company but the defendants changed it, resulting in more lateral clearing and grubbing work by the claimant of some 20 to 50 feet along 2,500 feet of line, which extra item is disputed by the defendants. The reason the defend *489 ants give for not accepting the company’s staking of the line was esthetic and emotional. It appears that the general manager of the Taconic Parkway wanted the wires hidden among the trees, and proceeded to remove those stakes upon which the hid was based and laid out his own stakes “ by eye.”
As the court reads the contract, and as far as the claimant was concerned, that job was the utility company’s and the claimant was required to do its bidding, especially since the staking followed the lines marked on the plans. As a matter of fact, in the preparation of its bid, the claimant had consulted Mr. Brown, the engineer of the electric company, as to the proposed line the poles would follow. The direction given claimant by Mr. Brown was the basis of its bid and became later the direction first grubbed and cleared.
Then, there are many points of direct contradiction between both sides as to what was done and when and why. These witnesses seemed to me to be reputable people. Most of their trouble and differences can be ascribed to the equivocal manner in which the contract, specifications, plans and work notes on the plans proper contradict or emasculate each other, resulting in confused thinking.
Regarding unsuitable materials, the contract also provides: ‘‘ Unsuitable materials shall be used for flattening embankment slopes and where otherwise directed by the Engineer. No additional payment will be made for the work but the cost thereof will be deemed included in the unit price bid for Item 2.” (Italics supplied.) The claimant excavated 7,883 cubic yards of unsuitable material.
The word “ used ” to the court means “ employ ”, not “ dispose.” When the contract says “where otherwise directed by the Engineer ”, to the court it means use or employ the unsuitable material where the engineer directs on the job. “ [W]here ” refers to “ use ” meaning “ use — where ” directed, not wasted where directed. To read otherwise would imply an undisputed right on the part of the State Engineer to order disposed of or wasted the unsuitable material, say 5 or 10 miles away where the commission might have a waste area, if it had one to offer, or waste it out of the contract area in some location also far from the job not contemplated in the contract or bid. The court agrees with the claimant that such was not the intent of the contract.
The State Engineer said the unsuitable material was ordered wasted because there was no use for it within the park. That being the case, why was such fact not spelled out in the contract? The claimant indicated it could use most of the unsuitable *490 material to flatten the slopes in the contract area. It was stopped when it had used only 100 cubic yards. The rest it had to cart away three quarters of a mile and give free of charge to a housing developer who used it in his development. The State Engineer testified that he made available to claimant a waste dump within the park some 3,000 feet away from the job. The claimant disputes that assertion and it is supported by the State’s written order to waste it outside of the park. The court believes the claimant for the reasons stated and because the State Engineer contradicted himself. He said that his superior, Mr. Dyer, did not want any part of the unsuitable material in the park and gave written orders to waste it outside of the park, while, at the same time he stated that he made available within the park a waste dump. If that were so, why would the claimant go out of the park and suffer greater expenses ?
Further, this contract, under Item 150-6, specifically exempts from its unit cost for iron pipe (at 30 cents a foot) connecting ‘ ‘ tees ’ ’ which it says ‘ ‘ will be classified as specials ’ ’ at 35 cents a pound.
The State contends that “ tees” are included in the required length of pipe at 30 cents a foot while claimant insists that they merely are included in the measurement of the pipe to figure the over-all length of the pipe but are unaffected by the unit price of the pipe. As a matter of fact, the State did pay for some extra tees it later ordered, at 35 cents a pound.
The disputed version of the contract reads as follows:
‘ ‘ The quantity to be paid for under this item will be the actual number of linear feet of pipe furnished and installed to the satisfaction of the Engineer.
“ Pipe shall be measured along the axis of the pipe and the measured length shall include fittings.”
This court interprets the contract to read as the State interprets it. The tees form an integral part of the length required for the pipeline. The claimant should have increased its bid on this particular item to include the price of the fittings within the measurement when it submitted its bid. The State did pay the 35 cents a pound for some extra tees, but not as a part of the contract. These extra tees were paid at their proper price because the claimant demanded the correct market price when it was faced with an extra or separate contract which, if the State would refuse to pay, claimant had a right to refuse to furnish.
Weyranch, Richardson on Contracts (p. 268): “In the absence of ambiguity and uncertainty the law presumes that the parties understood the import of the words they used and their *491 ultimate legal effect. Dwight v. Germania Life Ins. Co., 103 N. Y. 341.”
In addition, the State refuses to pay for the partial paving of a portion of the existing roadway within the park, insisting that the contractor caused the damage, whereas the contractor vehemently asserts that the pavement was bad and deteriorated before it entered the job and that its equipment caused only minor cracking along the edges of the pavement for which it accepted responsibility. The photos are persuasive of the claimant’s contention. These disclose extensive intermittent repairing which indicates a general deterioration of the pavement with the worst portions repaired. It does not seem probable that direct damage, if it had been caused by heavy machinery, would have been caused only at random spots.
Also, there were changes made by the State in some portions of the contract which, although small, were not furnished within a reasonable period of time, further holding up the claimant’s progress on the job.
The court is of the opinion that the claimant could have completed its job much sooner if all these disturbing elements had not arisen, and could have taken advantage of some portion of the Winter shutdown, especially, to do work in the swampy area.
As stated hereinabove, the representatives on both sides who testified seemed to the court to be sincere men, although the State Engineer evidenced a caprice in his orders plus an indifference to requests for instructions which were requested by claimant as to a number of disputed elements which resulted in serious delays.
The system adopted in effectuating contracts leaves much to be desired; too often the human element is called upon to make decisions without clear directions or unequivocal basis for judgment. The court is bound to devolve an equivocal provision of the contract or the interpretation thereof against the one who drew it. That is fundamental law. (Liverpool & London & Globe Ins. Co. v. Kearney, 180 U. S. 132; Gillet v. Bank of America, 160 N. Y. 549; Taylor v. United States Cas. Co., 269 N. Y. 360.)
However, .the court is satisfied, too, that not all the delay was caused by the State. It was either caused by the elements (admittedly, two months of Winter shutdown), or because the claimant chose to wait on some of its work when it could have proceeded on other phases of the contract. It is the obligation of the claimant, also, to lessen the damage as much as possible. (France & Canada S. S. Corp. v. Berwind-White Coal Mining Co., 229 N. Y. 89; 25 C. J. S., 562.) In the opinion of the court, *492 however, the interference or caprice of the defendants was the most substantial cause for the delay.
During the periods of delay, namely, January 9 to May 4, 1961, as testified to by the claimant, it was forced to keep its equipment and organization together at a cost to it of some $8,605 a month, which it claims now in addition to the extra charges for work, labor and material.
At the end of the trial, without objection by the State, claimant moved to conform its claim to the proof. The motion was granted.
The claimant introduced in evidence, without objection, as stated above, exhibits, each itemizing the various claims for damages herein, which unlike the claim itself or the bill of particulars, have been fully finalized and include overhead and loss of profits in addition to correct specific items as revealed by the claimant’s books and records. These items should have been correct in the first instance. Although their admission was not objected to, nevertheless the claim was drawn haphazardly and caused trial difficulties.
The totals of these various items are set forth to present a clear understanding of the damages proven:
[Remainder of opinion omitted as not of general interest.]