## UNITED STATES v. LEE HUEN, and fourteen other cases.

(District Court, N. D. New York. October 6, 1902.)

1. ALIENS—EXCLUSION—PROVINCE OF COURTS.

The power to exclude or expel aliens, being one affecting our international relations, is vested in the political departments of the government, and is to be regulated by treaty or act of congress, and executed by the executive authority, except so far as the judicial department has been authorized or is required by the constitution to intervene.

2. SAME.

The mode and manner of ascertaining the fact of citizenship, as a means for excluding or expelling aliens, is exclusively within the power of congress, acting within its constitutional limitations, to determine; and it may vest the power to determine such fact exclusively in executive officers.

3. SAME—PROCEEDING FOR DEPORTATION OF CHINESE—EVIDENCE.

Proceedings for the exclusion or deportation of Chinese aliens under the exclusion act are not criminal in character, and if the defendants therein fail to give testimony in their own behalf to explain doubtful matters peculiarly within their own knowledge or to contradict testimony given against them, such fact may be considered, where the testimony is contradictory.

4. SAME—BURDEN AND MEASURE OF PROOF—SATISFACTION OF COURT OR COMMISSIONER.

The provision of section 3 of the Chinese exclusion act of May 5, 1892 (27 Stat. 25), which places the burden on a Chinese person or person of Chinese descent arrested thereunder to "establish by affirmative proof, to the satisfaction of the justice, judge or commissioner, his lawful right to remain in the United States," requires him to produce credible evidence sufficient to satisfy the judgment of a reasonable man. considering the same fairly and impartially. A commissioner may not, arbitrarily, capriciously, or against reasonable, unimpeached, and credible evidence, which is uncontradicted in its material points, and susceptible of but one fair construction, refuse to be satisfied; but, on the other hand, he is not bound to be satisfied by the testimony of a single witness as to facts which, if the testimony is true, must necessarily be known to other obtainable witnesses who are not produced.

5. SAME—CREDIBILITY OF WITNESSES.

While it is impossible to prescribe any fixed rule by which the credibility of a witness is to be tested, or which shall bind the conscience of the court or commissioner, the record should ordinarily disclose to the appellate court something to justify the refusal to give his testimony full faith and credit.

6. SAME—CITIZENSHIP OF DEFENDANT.

Upon the issue as to the citizenship of a person of Chinese descent, evidence from a male person, not the father, that the defendant was born at a certain time and place in the United States, unaccompanied by any details as to how or why the witness knows such fact, is not conclusive on the commissioner or court.

7. WITNESSES—CREDIBILITY

The credibility of a witness may be affected by circumstances or by his own testimony, as well as by contradictory evidence; and the improbability of his statements, or his apparent lack of memory, accuracy, or intelligence, as well as his apparent lack of truthfulness, may justify a refusal to accept his testimony as satisfactory, even though uncontradicted.

---

¶ 3. Citizenship of the Chinese, see notes to Gee Fook Sing v. U. S., 1 C. C. A. 212; Lee Sing Far v. U. S., 35 C. C. A. 332.

**8. PROCEEDINGS FOR DEPORTATION OF CHINESE—CREDIBILITY OF WITNESSES—INTEREST.**

The mere fact that a witness for the defendant in a proceeding for deportation is himself a Chinese person does not render him an interested witness, within the rule which permits interest to be considered as a discrediting circumstance.

**9. SAME—CHINESE WITNESSES.**

In proceedings under the Chinese exclusion act, the testimony of Chinese witnesses, unknown and coming from a distance,—especially that of foreigners,—may be regarded as more or less weak; and, when contradicted or really discredited in any of the modes recognized by our law, the commissioner is justified in regarding it as insufficient, standing alone, to convince the judicial mind, where he acts from a fair conviction that the case is not made out; and in such case the appellate court is not warranted in reversing his finding.

**10. SAME—SUFFICIENCY OF EVIDENCE.**

Evidence considered on appeal from the decisions of a commissioner ordering the deportation of Chinese persons, and such orders affirmed.

## Appeals from Orders of Deportation by United States Commissioners.

### United States v. Lee Huen, alias Ui Lee Huen.

This case presents the questions: (1) Was the evidence given by the defendant, who had the burden of proof, sufficient to demand a judgment that he was born in the United States? And if so, (2) was the evidence given on the part of the United States sufficient to overcome that presented by the defendant? And (3) on the whole evidence was a case made establishing the defendant's right to be and remain in the United States? The defendant admitted that he is a Chinese person, and not a member of the exempt classes; that he came into the United States from the dominion of Canada on or about July 21, 1902, and was apprehended as stated in the complaint and warrant. The defendant was not sworn, and there is no evidence showing the point of his entrance, or the circumstances attending it. The defendant called Ui Jee, a Chinese person, and the United States called Tow Dong, a Chinese person. These were the only witnesses sworn, and both gave their evidence through an interpreter. Thirty days intervened between the examination of Ui Jee and that of Tow Dong. The substance of the testimony of Ui Jee is: That he is 57 years old. Has been in the United States 28 years. Came from China with his brother and wife, and landed at San Francisco. Went thence in 3 or 4 days to Colfax. That this defendant was born there to his brother and wife. That witness remained at Colfax 18 years, and then, with his said brother and wife and this defendant, returned to China, where witness remained about a year, when he came again to the United States, and now resides on Park avenue, New York. Says Colfax had a Chinese population of several hundred, and he cooked for Wing Ling, and that his brother was bookkeeper for same man. Has never seen his brother since leaving Colfax. Does not know whether he is living or dead. Sister-in-law never writes him. Was surprised to find this defendant in the United States. Found it out by a letter from him written from the jail at Malone and sent to Hom Mon Kip, who lives in laundry with witness, and who has been known to him a year. Says Hom Mon Kip delivered defendant's letter, but it was not produced. No explanation is given why the defendant wrote Hom Mon Kip instead of his uncle, the witness, or how defendant came to know him or of him. This person was not called as a witness. This completes the defendant's case. This witness was not impeached, and there is nothing against his character. His appearance and manner of testifying were good, so far as appears on the record. It does not appear that he hesitated or showed bias or interest, except that of relationship. He gives none of the particulars or circumstances attending the alleged birth of the defendant in the United States, nor was he questioned on this subject. The government then called Tow Dong, who, according to his testimony, lives at 16 Pell street, New York, and has been in the United States 28

years, and is 42 years of age. Landed at San Francisco, Cal., remained 3 or 4 days, and went thence to Colfax, where he remained 18 years, cooking and doing odd jobs. Says population of Colfax was five or six hundred white people and a few Chinese; that he knew the witness Ui Jee in China, who is an uncle of his by marriage; that they came to the United States together on same boat; that Ui Jee was married before he came to the United States, but his wife did not come over with him, and neither witness had any relatives on the boat that brought them over; that Ui Jee had no brother who came with them. Says he and Ui Jee went to Colfax together, and came from there to New York together; that Ui Jee had no brother in Colfax, and has never been back to China. He gives particulars of their residence in China which are not contradicted. He was subjected to a rigorous cross-examination, but nothing was developed affecting his general character, and, from the record, nothing can be said against his appearance and manner of testifying. In some collateral matters he did show lapse or want of memory, and this somewhat weakens his testimony. The testimony of Ui Jee is weak and unsatisfactory, in that it does not give any of the circumstances attending the birth of the defendant. Was the witness present in the same house, or, if not, where was he? Did a physician or midwife attend, and if so, who? He is squarely contradicted by Tow Dong on the material points of the case, either directly or indirectly. If the brother and wife of Ui Jee did not come over as stated, then their son, the defendant, was not born in the United States at the time and place mentioned, and no evidence of his birth in this country has been presented. If Ui Jee has not been back to China since he came over, 28 years ago, he did not see the defendant in China. The discussion of the legal principles controlling this and other cases will be reserved until the facts of such cases have been stated.

### United States v. Chan Hin, alias Chin Hen.

The question in this case is whether or not the defendant's name is Chin Hen, and he is the partner of that name in the Chinese mercantile firm of Sun Kwong On & Co., doing business at 33 Mott street, New York City. The defendant is a Chinese person, and not claimed to be a citizen of the United States. It is claimed that he is a merchant and a member of the firm named, and not a Chinese laborer, and hence entitled to be and remain in this country. Two or three witnesses state more or less positively that they know Chin Hen, have seen him working with the firm at its place of business, 33 Mott street, city of New York, and that he was recognized as a member of that firm. They claim to identify this defendant as that man. Other witnesses, with equal, if not greater, positiveness, assert that they know the defendant, and identify him. One says he knew him in China, and knows him here,—pointed him out in court; that his name is Moy Pin Kong, and that he is a son of Moy Nai Pok, well known to him; that defendant went by that name (Moy Pin Kong) in China; that defendant stated to him a few months since, prior to the commencement of this proceeding, at Malone, that he was ordered deported, and must go back to China. The evidence shows that when a Chinaman marries he changes his name, taking that of the wife, but does not change his surname. No attempt was made to explain when or why defendant changed his name, if he ever did. Another witness says defendant's name is Moy Bing Keong, and his father's name is Moy Nai Pok, and that he knew him (defendant) in Worcester, Mass., where he was a laborer in a laundry, and also knew him in Boston. The defendant was not sworn. If the defendant is in fact Chin Hen, member of the firm mentioned, the fact was susceptible of overwhelming proof by witnesses living and doing business in the city of New York, and ample time was given for the production of such witnesses. The difference in the spelling of defendant's alleged name, as given by the witnesses mentioned, is not material. Such differences are not at all unusual. The evidence given by the witnesses who claimed to identify the defendant as Chin Hen, member of the mercantile firm, is not strong or necessarily convincing. Two, at least, showed an interest sufficient to seriously impair their credibility as witnesses in this case. It is not at all improbable, and the evidence will justify the conclusion, that

this so-called Chin Hen, the defendant Moy Pin Kong, or Moy Bing Keong, is not a Chinese merchant, or the Chinese merchant Chin Hen, if there be one, but a Chinese laborer working at the laundry business, or as a helper in any business wherever he goes, and that he passes himself off, and is passed off by his countrymen, as a member of the firm, for the purpose of keeping him in the country. It may be that he was in the store at Mott street, working at packing goods, etc., as mentioned by his witnesses; but if he is Chin Hen, the merchant, and a member of that firm, why was he in Malone, as described, confessing his judgment of deportation; why in Worcester, working as a laundryman; why in China with another family name; and, finally, why was not an effort made to contradict or discredit this testimony? Was not a question of fact, on contradictory and conflicting evidence, fairly presented? Can it be said the finding of the commissioner was against the weight of evidence? Was not the determination of the credibility of those witnesses for the commissioner? Is there anything that suggests he acted capriciously or arbitrarily, or was swayed by prejudice?

United States v. Fong Ham, alias Ho Fong Sing, and Yee Yim, alias Ho Yee Duck.

It was conceded that the defendants are Chinese persons, not members of the exempt class, and that they came into the United States from the dominion of Canada, as charged in the complaints and warrants. The only question presented is the sufficiency of the evidence to satisfy the commissioner that the defendants, who claim to be brothers, were born in the United States. Only one witness, a Chinese person born in China, an alleged uncle of the defendants, gave testimony. He says: "Am 36 years old. Have been in the United States 23 years. Came from China with my brother and sister-in-law [this brother's wife, presumably], landed at San Francisco, and remained there ten years, at 503 Dupont street," and while there the defendants were born, and are nephews of the witness. It is left to conjecture whether or not they are the children of the brother who came over with him; whether or not the sister-in-law who came over at that time is the mother. Says that at the end of the 10 years he returned to China, and his brother, sister-in-law, and the defendants went with him. Witness remained in China one year, then returned to the United States, landed at San Francisco, where he remained five days, when he came on to New York, where he remained 10 days, and then went to Brooklyn, where he remained 8 years, and then returned again to China, and remained 1 year. States that he saw the defendants there daily during that year. The witness then returned to Brooklyn, and has resided at 457 Central avenue, Brooklyn. Says the boys, Ho Fong Sing and Ho Yee Duck, identifying the defendants in court, are the same persons who were born in Dupont street, San Francisco, Cal., and the same he saw in China, as stated. On cross-examination, says he lived at Ho Uk with his father and this brother before he first came to the United States, and attended school two years. The brother married Wong She, who lived at Wong Uk, two-thirds of a mile from his father's home, but witness does not know whether she had any brothers or sisters. In China he knew Ho Sew, Ho Lew, and Ho Fat, aged 14, 12, and 13 years, respectively, but remembers no other persons he knew in China. He gives the day, hour, and minutes of his leaving home, arrival in Hong Kong (except the day and minute), and arrival in San Francisco (except minutes). He then says he and this brother (alleged father of defendants) ran a store at Dupont street those 10 years, and that he (the witness) had $300 in the firm, which he borrowed from a friend, Ho Kong, who came with him from China to the United States. He had failed to recall the existence of this financial friend and backer of his childhood when asked to give the names of persons he knew in China. He names the firm of Hop Lung, on Dupont street, but forgets the address, and cannot remember the name of any other firm or the location of any firm in Dupont street, except his own. Says he seldom went out, and does not know or remember the streets running parallel with, or those crossing Dupont street, although he was doing business in the store No. 503 Dupont street, buying and selling goods and cooking, all the time while he grew from 13 to 23 years of age. Does not remember the par-

ticulars of his arrival in New York and Brooklyn. He does not state, and no one asked, the ages of the defendants, or as to any of the circumstances of their birth or life in San Francisco. All this evidence amounts to is that the defendants enter the United States from Canada and are arrested. A Chinese person from Brooklyn, whose general character is not impeached or questioned, claims to be their uncle, and says they were born in Dupont street, San Francisco, Cal., at some time during the 10 years following the coming of their parents to the United States, and went with their parents to China, where they were seen by this uncle every day for a year on a visit he made to his native land eight years later. This witness exhibited such a vivid, special, and remarkable memory as to some things, and such an absolutely blank memory as to others he would naturally observe and remember, that the commissioner doubted his truth and veracity, and held that his testimony did not establish to his satisfaction that these defendants were born in the United States. Does it establish the asserted fact? The record discloses no evidence to the effect that the financial precocity of the Chinese race generally, or of this witness in particular, justified this alleged loan of the $300 to a boy of 13, who had no property, so far as appears, gave no security, had no business experience, and only two years' schooling. On the other hand, it may be urged with great force that this boy's friend had the right to let him have the money; that the sum is not large, and that such acts of friendship, even towards boys, are not uncommon; and that the story is not improbable. This story, however, did not relate directly to the point in issue, but to a collateral matter, and same is true of the rather remarkable exhibitions of memory and want of memory in the witness. May the evidence of a witness be disregarded when the only discrediting features are of this nature, and appear in a detailing of such collateral matters? Does the law compel the commissioner to be satisfied with such evidence, and may or ought the appellate court to reverse the judgment of the commissioner who acted thereon? Had the defendants produced no evidence, judgment of deportation would have followed of course. Having presented some evidence, which is discredited only as stated, the question is, was the commissioner bound to be satisfied therewith?

United States v. So Ho Lung (2d), alias Ching So Ho Lung (1,290), and Wong Hum, alias Ching Wong Lem (1,329).

Admitted that defendants are Chinese persons, not members of the privileged classes; that they came into the United States from the dominion of Canada, and were duly apprehended, as charged. The only questions to consider in this case are the credibility of the defendants' witness Chong On, and the sufficiency of the identification of the defendants made by him. No other witness testified. Chong On is 43 years old. Has been in the United States 24 years. Came from China with Chong Sew and Chui See, his brother and sister-in-law. Landed at San Francisco, and was there for 14 years, living at 503 Dupont street. Says the record: "Did Chong Sew have any children born in San Francisco while you were there? A. He had two,— Chong So Ho Lung and Chong Wong Lem. Q. Are those the two defendants in court? A. Yes." Witness went to China at the end of the 14 years, and remained a year. Came back to the United States, and has been in New York 9 years. Says Wong Lem is 20 years of age; the other, 22. For 9 years he had not seen them, until he saw them in court at Malone. Hence one was 11 and the other 13 when he last saw them in China. The last question on the direct examination of this witness was: "Are the defendants in court, Chong So Ho Lung and Chong Wong Lem, the same boys that were born at 503 Dupont street, and that you took home to China with you? A. Yes; the same." No more leading and suggestive questions could have been asked, but no objection was made. It is evident the witness assumed the defendants were present in court, expecting to be identified by him, and that he was there for the purpose of making the identification. When the witness reached Malone, and whether or not he had had an opportunity to see and identify the defendants before going to the court room, does not appear. If he had the opportunity, and did not avail himself of it, the claim may fairly be made that he was willing to testify to their identity in all events. The record does

not show whether other Chinamen were in the room. In any event, in the first instance the defendants were pointed out to the witness by their counsel, and the suggestive question quoted asked at the same time. No other answer would be expected from a witness 'brought there to identify the defendants. On the cross-examination, when counsel for the government came to the question of identification, this took place: "Q. Which is the defendant that has a scar on his face? A. I don't remember any scars. Q. Didn't have any scars when you last saw them? A. I don't remember anything about it. Q. You don't remember much how they looked when you last saw them, do you? A. I cannot remember their faces very well. If I saw them, perhaps I would remember them; perhaps not. Q. You are not very sure about it? A. I cannot describe their faces. If I saw them, I would remember them. Q. They have changed a good deal in 9 or 10 years, haven't they? A. They have changed somewhat, and perhaps I cannot recognize them. Q. You are not perfectly sure that you would be able to identify them? A. I am not positive." Redirect: "Q. Point out the defendants. A. (The witness did this by touching them.) Q. Would you know them in a thousand? A. I would remember." Recross: Denied having seen them in the jail, or before seeing them in the courtroom. "Q. And the first you saw of them was when you saw them sitting on the bench here? A. I recognized them as I came into the room. Q. You haven't spoken to them,—haven't said a word to them? A. Not a word." Remembering that this witness is the uncle of the defendants, if they are the children of his brother, as witness claims, and that he had not seen them in 9 years, we are somewhat surprised that, when he found them under arrest and in court, he did not at once speak to them, if he recognized them when he came into the room. Did he recognize, but neither speak nor attempt to speak to, his two nephews, under these circumstances, after 9 years' separation? Strangers to all about them, in a land far from home, confronted by their uncle, who gives no word or sign of recognition or sympathy. The defendants, so far as appears, did not recognize their uncle. This identification did not satisfy the commissioner. The witness had previously shown a very weak or nonretentive memory as to Dupont street, where he resided 14 years, and could only remember two persons, aside from his father and brother, he knew in China when he left, at the age of 19 years. At that age he must have known scores of people at his home in China by name, and that he forgot all but two in 24 years, and still could remember and identify these two boys, whom he had not seen in nine years, and who must have changed greatly in size, action, expression, and appearance, is hardly credible. Such evidence cannot be said to compel the mind and judgment of an intelligent man, acting judicially, and required by law to be satisfied, or to have the fact proved to his satisfaction, to accept the identification, or believe these defendants were born in the United States at the times and place mentioned by the witness. It may be urged that to give to this evidence the effect claimed would enable nearly every Chinese laborer in the Chinese empire, between the ages of 10 and 30 years, who comes to this country, to establish in court that he is a citizen of the United States, and evade the law altogether. But be the result what it may, rules of evidence established by the decision of the courts and by statute, if any, must be applied and adhered to.

United States v. Wong On, alias Chin Wong On, and Chin Yuen.

This appeal presents the single question whether or not the commissioner was bound to accept as true the testimony of a single witness, Chin Way Soy, a Chinese person 50 years old, now living in the United States, who testifies that he has been in the United States 27 years, and is the uncle of the defendants, sons of an older brother, aged 22 and 25 years, respectively, and that they were born in a shoe factory on McComb street, San Francisco, and went to China about 16 years ago. The witness also states that about 21 years after first coming to this country he went to China, and saw these defendants there frequently during the year he remained. He states that he is only visiting in New York City; has worked but very little; works with friends; has no steady residence; sleeps wherever he works, and works wherever he sleeps; and lives in Chinatown, New York City, mostly. Says

he lived at 85 McComb street, San Francisco, 9 years, and on Dupont street for 5 years. Cannot remember the number, does not remember the years he left either street. Does not know the name of a single store on Dupont street, or of any store in Chinatown, San Francisco, and does not know any persons who lived in San Francisco when he left there. His story is hazy and unsatisfactory in some other particulars. We have here a strange, and, in a sense, a tramp, Chinaman, who, testifying to the birth of two children in San Francisco at the times and place mentioned, fails to remember other facts as to collateral, but important and pertinent, matters, which he must have known if he was there as stated, and which he must remember if he has sufficient mind and memory to recall the birth of and identify the defendants. The collateral matters referred to are important and pertinent on the question whether or not he was at San Francisco, as stated by him, and could have known of the birth of these defendants, and also on the question of his memory generally.

United States v. Chin How (1,379) and Chin Tung, alias Chin Tank (1,380).

Only one witness was sworn in this case; it having been admitted that defendants are Chinese persons, not members of the exempt class, and that they came into the United States from the dominion of Canada, and were apprehended, as charged. Is this testimony, given by the alleged uncle of the defendants, so contradictory that the commissioner was justified in holding that the birth of the defendants in the United States had not been proved to his satisfaction? Sam Sing (Chin Sam Sing), a Chinese person, says he is 45 years old; lives at 14 Main street, Yonkers, N. Y.; has been in the United States 25 years. Says on direct examination that he landed at San Francisco, where he remained 3 months, when he went to Chico, where he remained 10 years. From there went to San Francisco, and remained 1 year, after which he came on to New York, where he remained a year and a half. Then went to China for 1 year, returned, and has been in Yonkers since. Has been in Yonkers 6 to 7 years. This time, allowing 3 months for travel, makes only 21 years. The witness says the defendants were born in Chico, and that Chin How is 24 years of age, and Chin Tung 23. Says the boys were in Chico when he left; that he saw them in China on his visit there; that his older brother wrote him the boys and their father and mother returned to China soon after witness left Chico. Says the defendants are his nephews, children of his older brother. On his cross-examination he repeated in detail his places of residence in the United States, and the time he lived in each place, without variation, and stated that he had not lived in any other place in the United States. There is nothing in the evidence given by the witness that discredits him in any way, except this variance between the time of his being in the United States, 21 years, allowing 3 months for travel, and the ages he gives the defendants, 23 and 24 years, respectively. He testifies to the last fact (that of age) as positively as to the former facts (those of his residence in this country). If the defendants were born in Chico, or elsewhere than in China, 23 and 24 years ago, the witness was in China at the time, and cannot know the fact testified to by him. If they were born in Chico when the witness was there, they are not of the ages sworn to. It cannot be law that the commissioner was bound to find that this witness was mistaken merely as to the ages of the defendants, or as to the time he had been in the United States. The discrepancy may arise from an honest error of the witness, from his ignorance of the facts, from his inability to add or subtract, or from his want of truth and veracity. This court will not undertake to guess where the truth is. It was for the defendants to prove the facts. The record shows that attention was sharply drawn to this discrepancy, and that no substantial effort was made to correct or explain. Was not the commissioner justified in holding that this testimony given by the alleged uncle, and entirely unsupported and uncorroborated, was too weak, uncertain, and contradictory to establish to his satisfaction that these defendants were born in the United States?

United States v. Wong Ching, alias Jung Wong Chong (1,382).

Only one witness was sworn in this case. It stands admitted that the defendant is a Chinese person, not of the exempt class, and came into the

United States from the dominion of Canada, as charged on the record. The testimony of the witness is so uncertain and contradictory that no court would be justified in acting on it to the prejudice of the rights of the United States; and even if we conclude that the witness intended to testify that he is the uncle of the defendant, and that the defendant is the son of the brother of witness, the failure of the defendant to procure the evidence of his father, who at the time of the trial was in San Francisco, and who must know all the facts, is fatal to his case. The right of a Chinese person to remain in the United States as a citizen thereof is of sufficient importance to require the production of substantial obtainable evidence from those who must know the facts, when such right is challenged by the law. At the close of the cross-examination of the witness the defendant's case was so weak that clearly further evidence was required. The witness testified on his direct examination that he came to the United States 28 years ago with his older brother and sister-in-law. His counsel immediately asked this question: "Did your older brother and your sister-in-law have any children born in San Francisco?" The answer is: "No. Q. What was your father's name? A. Jung Kun. Q. Did Jung Kun have a son born in San Francisco? A. After one year in the United States, one son was born to them. Q. What was his name? A. Jung Wong Chong." He then says the defendant is that child, and that he (witness) returned to China with the defendant and his mother, and that witness remained there two years. In court he claimed to identify the defendant as the same person born in San Francisco. The direct examination left the evidence in this shape. On cross-examination the witness states where he lived in China (Kut Chai), and then: "Q. What was your father's name? A. Jung Fonf, a farmer. Q. What is your brother's name? A. Jung Kun. Q. Did you have any other brothers? A. No. Q. Where does he live? A. He is in San Francisco at present. Q. Where did he live in China? A. Kut Chai." Brother always lived there with his father before coming to the United States, 28 years ago. Then: "Q. What 3 persons did you know in this village in China [Kut Chai] when you left there? A. Jung Choy, Jung Sze, Jung Sing. Q. You didn't know any others that lived in that village. A. That's all." As the witness was 15 years of age when he left Kut Chai, a village with a population of 150 persons, it is hardly credible that he knew 3 persons only. States he went to school one year. Some other scholars, "but I didn't know them." Says, also, he never went outside the village where he lived until he left for this country. He also states that after they reached San Francisco his brother and wife lived in the second story—no one else—at 511 Dupont street; witness in first story, same house. Third floor used as a warehouse. Only remembers that one place in San Francisco, although he lived there 16 years at same number. Knew no other person who lived there in San Francisco. Lived there 1 year before this defendant was born. Never went upstairs until the child was born, when he went up with food. These statements and other inconsistencies and contradictions made it impossible for the commissioner to believe the testimony of the witness relating to the alleged birth of the defendant in San Francisco. As matter of fact, who would? As a matter of law, was he obligated to be satisfied with this improbable statement?

United States v. Yet Sang, alias Wong Yick Song (1,227), and Fong John, alias Wong Fong Chun (1,221).

The only question in this case is, were the defendants born in the United States? If so proved, the defendants are entitled to a reversal of the judgments and to be discharged. Tong Yuen, for defendants, says they were born in Austin, Nev., 22 and 17 years ago, respectively, and are children of a brother of the mother of the witness. Lee Huen, for the government, says he is first cousin of Tong Yuen; knows the family; tells how and why, when and where, he knew them; and that his mother and Tong Yuen's mother were sisters, and the only children, and had no brother or brothers; no boy in the family. It follows that the whole story of the defendants' only witness is discredited to an extent, at least, and that serious doubt, to say nothing further, is created as to the truth of his statement regarding the birth of the defendants. Was not the commissioner justified in deciding that

such evidence did satisfy him, when in fact it did not? The government witness was longer in China, and knew most about the family.

**United States v. Soo Hoo We (1,226) and Chong Jack, alias Soo Hoo Chong Jack (1,229).**

The only question in dispute is, were the defendants born in the United States? Defendants called Lee Fook, and the government called Fun Tang. These witnesses flatly contradicted each other on the main issue, and then the defendants called Frank C. Parks, born in China, who contradicted Fun Tang as to the population of Sun Nieng, China. The commissioner and this court can place as much confidence in the one witness as in the other on the main issue. The defendants did not, on the whole evidence, make their case.

**United States v. Ah Wing, alias Chun Ah Wing (1,303), and Bak Hen, alias Chun Bak Hen.**

Moy Tong says defendants were born in the United States. Moy Gop Jung, a relative of the family by marriage, testifies for the government to matters which, if true, demonstrate that Moy Tong's statement is not true. Neither witness is seriously discredited, except by this flat contradiction. Clearly, the defendants did not make their case.

**United States v. Jung Lee (1,330) and Lee Gung (1,331).**

Conceded that the defendants are Chinese persons not members of the exempt class, and that they came into the United States from the dominion of Canada, and were apprehended, as charged. It is contended that inasmuch as the only witness in the case, Young Sue, gave direct and positive testimony that the defendants, Jung Lee and Lee Gung, were born in the United States, and later were seen by him in China, and are now identified by the witness, and he is not impeached or discredited, except by some contradictions in his testimony, claimed to be either errors of the stenographer in reporting the testimony, or the result of a prolonged and severe cross-examination, or the error of the interpreter, or errors of computation hastily made, the commissioner should have held, and the court should now hold, that the defendants established their case, and sustained the burden of proof which the law casts on them; that the refusal to so hold was an error of law. The facts testified to will be stated fully, as the question is an important one, and ought to be settled, for the guidance of commissioners in future cases. Young Sue, through an interpreter, says, in substance: That he lives at 648 Bedford avenue, Brooklyn. Has been in the United States 25 years. Landed at San Francisco, and remained 1 day, when he went to San José, and remained there 10 years. That he then returned to China, and remained 5 years, when he returned to New York, where he has lived 10 years. "Q. Do you know the defendants, Jung Lee and Lee Gung? A. They are nephews from an older brother. Q. Do you know where they were born? A. San José. I don't remember the street or number." Their father's name is Young Lum, a farmer. Says he (the witness) was living in San José with his brother and sister-in-law when defendants were born, and saw them there frequently. "Q. Did you see them afterwards in China? A. I saw them there." Says Jung Lee is 22, and Lee Gung 24, years of age. "Q. How old was Lee Jung when you saw him last in China? A. Nine. Have you seen the defendants since they left San José? A. I saw them again in China." Then says that his brother and sister-in-law came to the United States with him, but does not at this point state when. This closes his direct examination. Cross-examined, he gives his father's name and business, and his brother's name and place of residence when in China, and states that this brother lived with the father up to the time he came to the United States, including the few months after he was married, which marriage took place before he came to the United States. Gives the population of the village where they lived, and names Young Hin Wah, Young Hin Nam, and Young Hing Fuy as the only persons he can remember who were living in that town at the time he (witness) lived there. Says he was 11 years of age when he left China, and gives the ages of the Youngs, and repeats that they are the only

persons he knew in China. Gives the time, with exactness, when he left his village in China, and when he arrived in San Francisco. Does not claim to remember some other minor matters. He states that his brother and sister-in-law came to the United States with him, and says his brother married Jee She. Gives the names of villages near his home in China, and the distances thereto. Says he stayed in San Francisco on his first trip one day. "Q. What time of day did you leave San Francisco to go to San José? A. I don't remember. Q. Was it in the afternoon or morning? A. Morning. Q. Don't you remember about what time it was? A. 6 a. m. Q. Are you sure? A. Yes; no mistake." He then describes the journey to San José, and what he did there. "Q. How many years had you lived there before Lee Gung was born? A. Seven years; Jung Lee, six years. Q. After you lived in San José 10 years, where did you go? A. New York. Q. How many years did you live in New York? A. Ten years." Says he then went to China for five years. Is now living at 648 Bedford avenue, and has three years. Before that, lived at Third avenue, Brooklyn, for three months, to best of his recollection. Before that, at 823 Fulton street for one year, and before that two months in Chinatown, New York,—32 Pell street. Before that, three months at Forty-Second street, New York, and before that does not remember. These are the only addresses in New York he remembers, and does not remember how long he stayed at other places since his return from China. Works at laundry business. He then states on redirect the first boy was born three years after he first went to San José, and second five years thereafter. "Q. How old were these boys when you left China to come to the United States the last time? A. One was seven, the other nine." In this testimony we find many contradictions. Are they material, and of such a nature as to affect the credibility of this witness. He says he left China at the age of 11 years, and first says that Lee Gung was born 7 years thereafter, when witness was 18 years of age; Jung Lee 6 years thereafter, or when witness was 17 years of age. He does not say he was present at their birth, or how he knows the fact. According to his statement, he remained three years at San José after Lee Gung was born, and then went to China and remained 5 years, and therefore Lee Gung was 8 or 9—he says 9—when witness left China last. But if Lee Gung was born 5 years after they went to San José, then he was 5 when witness went to China, and 10 when he left, and witness made an error of 1 year in giving the age. He stated distinctly on the cross that Lee Gung was born 7 years after they went to San José, and on redirect changed to 5; evidently endeavoring to correct the discrepancy his testimony exhibited if the boy was 9 when he saw him in China. He was in error in either event. This error of figures alone does not necessarily indicate a purpose to misrepresent. The witness gave no reason for changing the time of the birth of defendants. There was also a serious conflict between his direct and cross-examination as to where he lived and where he went on leaving San José. On the direct he went from San José to China, while on the cross-examination he went from San José direct to New York. His inability to account for himself in New York during 6 of the last 10 years is also a fact of importance; also his lack of memory regarding persons in China. His inability to remember the street on which the defendants were born may indicate either ignorance of the facts or failure of memory. The witness, now 36 years of age, stated that he could not remember the time of day he left San Francisco for San José, but, on being pressed, perhaps thinking it would help the case, testified that it was at 6 o'clock in the morning,—"no mistake." True, he may have recalled that fact, but it was for the commissioner to judge the truth of the witness. The commissioner saw this witness, and observed his manner and appearance, and can it be said that this testimony is so connected and straightforward and evidently reliable that the commissioner was not justified in refusing to accept it as satisfactory evidence that these defendants were born in the United States? Are boys of that age likely to know of the birth of nephews, and remember about it, when they cannot tell the street or number where the event occurred? Is it unfair to suspect that his failure to state where he has lived in New York for 6 years and 6 months since his return from China is not due to failure of memory, but indicates want of truth? The.

testimony of the witness does not show that he knew anything of the actual birth of those children. His knowledge on that subject must have been largely hearsay. Was not a question of fact for the determination of the commissioner presented? Does not this testimony itself create such a doubt of its truth or reliability that reasonable and prudent men are justified in refusing to accept it as satisfactory proof of the fact sought to be established?

United States v. Yee Min, alias Chin Yee Min (1,309), and Chin Rock Ting, alias Chin Pak Ting (1,306).

It having been admitted that defendants are Chinese persons not of the exempt class, and that they came into the United States from Canada, and were apprehended, as charged, Low Ming, for the defendants, testifies that defendants are children of his older sister, and were born at San José, Cal.; that one is 22, the other 20, years of age; was not present at birth, but saw them about two weeks thereafter. When the oldest defendant was 8, all went back to China. Defendants are just reappearing in this country. The witness says he had a younger brother. Chin He, for the government, says he knew Low Ming and his family in China, and has known him here, and states positively he did not have a sister or a brother, and that he came to the United States only 17 or 18 years ago. Low Ming says he came 24 years ago. These witnesses are so at variance on material points that it is not possible to more than guess at the truth. There is no preponderance of credible evidence. The commissioner could not well have been satisfied from the testimony before him that the defendants were born in the United States.

United States v. Yee Ark Tai and Woo Fun, alias Yee Woo Fun.

It was admitted that the defendants are Chinese persons, not of the exempt class, and that they came into the United States from the Dominion of Canada, and were apprehended, as charged. Young Jung, of Pell street, New York, testifies for the defendants, and states, in substance, that he came to the United States from China 22 years ago, and was at Salmon Island, Cal., for 7 years; then at Brooklyn 9 years; then in China one year. On his return from China he came to New York, and has been here 5 years. Testifies he had an older sister, and that she had two sons born in the United States, who returned to China when 6 and 4 years of age, respectively; that he (witness) had been here about 1 year when these sons were born, and they returned to China with their parents. This makes the defendants 19 and 20 years of age, respectively. Witness says Yung Chee was 27 when he (witness) first came to the United States, and was only 36 when he went back to China, 16 years later. Yung Tin was 10 or 12 when witness came to the United States, and only 18 or 19 16 years later, when witness was back in China. Says he is sure about these ages of the persons described. For the government, Young Shai Foo says he knows and identifies Young Jung; knew him and his family well in China; is his cousin; that their mothers were sisters; and that Young Jung had no sister. This witness identified a photograph other than that of Young Jung as that of Young Jung, but did not fail to identify Young Jung's photograph. There is nothing to show how close the resemblance was, and hence this error is not very significant here. The main contradiction is that Young Jung had no sister, and hence the sister of that witness did not give birth to the defendants. If in error as to having a sister, he is easily in error as to the birth of the defendants. The commissioner was not satisfied the witness told the truth, and such contradictory evidence, read all together, failed to establish the main facts to his satisfaction.

United States v. Lin Park and Lee Choy.

It being first admitted that the defendants are Chinese persons, not of the exempt class, and that they came into the United States from the dominion of Canada, and were apprehended, as charged, Di Ging, who, according to his testimony, resides at 16 Pell street, New York City, is 46 years of age, was born in China, and came to the United States 22 years ago, and resided at San José for 12 years, and has been in New York since, further testified that he knows Lin Park, aged 20 years, and Lee Choy, aged 18 years, the defend-

ants, and knew them in San José. Being asked, "Where were they born?" he said, "San José." Being asked when they returned to China, he said one was 10 and the other 8 years of age when that occurred. He also says they were sons of his older sister, and their father's name was Woo Ah Tuk. On cross-examination he states some facts regarding his life, etc., and says Lee Choy was born 4 years after the witness came to the United States, or 18 years ago. He has not seen the defendants before in 10 years; hence one was 8 and the other 10 when last seen by the witness. Asked, "How did you recognize them?" he said, "I remember them;" no physical marks. He was then asked how he knew they were in jail at Plattsburg, and answered that he had a letter from them, sent from the steamer, saying "they were going to be in jail here." Letter also told him the trial would be the day it took place. He was told to go to an attorney, which he did, and the attorney took him over to testify. Chu Hall, for the government, testified that he knows the witness Di Ging, knew him in China, and also knew his father and family,—visited them often,—and that Di Ging had no brother or sister. It is evident that the defendants expected to bring up in jail before they landed in America, and that this witness was expected to be on hand to make a case for them. This is hardly consistent with the claim that they were born in the United States. In any event, there was such a conflict of evidence that the commissioner's judgment should not be disturbed.

## United States v. Fook Chung, alias Fook Taing.

It was admitted that the defendant is a Chinese person, not a member of the exempt class, and came into the United States from the dominion of Canada, and was apprehended, as charged. Tsang Tsun testified for the defendant, Lem Sing for the government, and Hom Bing for the defendant in reply. All are Chinese, and gave their testimony through an interpreter. Tsang Tsun resides at Ridgewood, N. J., is 39 years of age, and came to the United States when 18. Says his brother Tsang Loong and his wife came with him to this country from China, and, after two weeks in San Francisco, went to Butte City, Mont.; that they all lived together, on a vegetable ranch, in the same house; that the defendant Fook Chang was born there 3 years after their coming to this country, and is son of this brother; that they lived there 8 years, when this brother, wife, and child all went to China; that witness came on to New York, where he lived five years, and then went to Ridgewood, and remained 4 years, when he went to China, and stayed one year, and then returned to the United States; that in China, on this visit, he lived in the same house with defendant. In court he identified defendant, and stated he is his only nephew. On cross-examination states he has no sister, and only one brother. The witness states about the birth of defendant, and there are no errors or discrepancies in his lengthy cross-examination. None of his statements are improbable on their face, except that the father, a vegetable gardener, was a doctor, and understood the business of attending women in childbirth. Lem Sing, sworn for the United States, says he is 43 years old, lives at 12 Pell street, New York, and came to the United States 20 years ago, landing at Portland, Ore., and then went to Spokane Falls and worked on the railroad; that he knows the witness Tsang Tsun, and knew him first when they worked on the railroad together. Says they came on the same steamer, and worked together at Spokane Falls 4 years. Has seen him a few times within the last few years. He identifies the photograph of the witness as the same person. The cross-examination of this witness did not shake or discredit his testimony, and contained no contradictions. It exhibits no want of intelligence or bias. Hom Bing, for defendant, testified that he knew Tsang Tsun in Butte City, Mont., and his wife, and that defendant was born there, and that he recognizes him, although he is not related, and has not seen the child since it was 4 years old, some 15 to 17 years ago. The cross-examination of this witness demonstrated that he knows nothing of the birth of this defendant, except by hearsay, and cannot identify him. His testimony, as a whole, is inherently improbable, and, as it appears on the record, fails to carry conviction that he was speaking truthfully. In fact, it gives the contrary impression, decidedly. If Tsang Tsun spoke the truth, the defendant made his case. If Lem Sing spoke the truth,

and was not mistaken in his identification, Tsang Tsun did not tell the truth. The other witness added nothing to the strength of defendant's case. The commissioner saw these witnesses, and observed their manner, etc., and hence was better able to judge their credibility. When the testimony given to establish a fact is evenly balanced, should not the judgment of the trial court be sustained on appeal?

Geo. B. Curtiss, U. S. Atty., and H. E. Owen, Asst. U. S. Atty.

Jas. F. Akin, for defendants Lee Huen, Fong Ham, Yee Yim, So Ho Lung, Wong Hum, and Wong Ching.

R. M. Moore, for defendants Chan Hin, Yet Sang, Fong John, Soo Hoo We, Chong Jack, Ah Wing, and Bak Hen.

B. W. Berry (R. M. Moore, of counsel), for defendants Wong On, Chin Yuen, Chin How, and Chin Tung.

J. B. Riley, for defendants Jung Lee, Lee Gung, Yee Ark Tai, Woo Fun, Lin Park, and Lee Choy.

John B. Riley (R. M. Moore, of counsel), for defendants Yee Min and Chin Rock Ting.

J. H. Booth, for defendant Fook Chung.

RAY, District Judge (after stating the facts as above). Having given a somewhat detailed statement of the testimony in these cases, it only remains to call attention to the rules of law and evidence applicable thereto, and which must control this court in determining the appeals.

The influx of Chinese laborers into the United States attracted the attention of the congress prior to 1880, and has resulted in the enactment of certain laws from time to time applicable to all classes of Chinese aliens within or seeking entrance into the United States. With the wisdom of these laws the courts and judges have nothing whatever to do. It is the duty of the judicial officers charged with their enforcement to accept such laws as wise and suitable to the conditions that demanded and secured their enactment, and interpret and (so far as they are found to be constitutional and capable of execution) enforce them accordingly. Unless a different course of procedure is provided by law, these statutes to prohibit or regulate the coming of Chinese aliens into the United States, or to expel them therefrom, are to be executed, and all trials thereunder conducted according to the established rules and practice of the courts of the United States in similar cases. Except as stated, the same rules of evidence are to be applied, and there should be no relaxation of these established rules in the administration of the law, on the plea that the laws are severe or rigorous. For the modification of such laws, if any modifications are desired, application must be made to the lawmaking branch of the government, which, within its sphere and constitutional power, is supreme.

Chinese persons within the United States (meaning thereby the organized states and territories), and their descendants, when born therein of parents residing here, and not employed in a diplomatic or official capacity under the emperor of China, are citizens of the United States, and, when such fact is established in the mode and manner prescribed by the proper authorities, are entitled to be and remain

therein, and are entitled to the equal protection of the laws. U. S. v. Wong Kim Ark, 169 U. S. 649, 18 Sup. Ct. 456, 42 L. Ed. 890. Residents, alien born, are also entitled to the equal protection of the laws. Yick Wo. v. Hopkins, 118 U. S. 356–369, 6 Sup. Ct. 1064, 30 L. Ed. 220; Wong Wing v. U. S., 163 U. S. 242, 16 Sup. Ct. 977, 41 L. Ed. 140. The power to expel or exclude aliens, being a power affecting our international relations, is vested in the political departments of the government, and is to be regulated by treaty or act of congress, and is to be executed by the executive authority, except so far as the judicial department has been authorized or is required by the constitution to intervene. Fong Yue Ting v. U. S., 149 U. S. 711, 713, 714, 13 Sup. Ct. 1016, 37 L. Ed. 905; U. S. v. Wong Kim Ark, 169 U. S. 699, 700, 18 Sup. Ct. 456, 42 L. Ed. 890. The mode and manner of ascertaining this fact of citizenship as a means for excluding or expelling aliens is exclusively within the power of congress, acting within its constitutional limitations, to determine. Fong Yue Ting v. U. S., 149 U. S. 698, 13 Sup. Ct. 1016, 37 L. Ed. 905; U. S. v. Wong Kim Ark, 169 U. S. 699, 700, 18 Sup. Ct. 456, 42 L. Ed. 890. The right to exclude or expel aliens of any nationality is our inherent and inalienable right as a sovereign and an independent nation, and this power may be exercised entirely through executive officers. Same cases. It follows that a proceeding under our law to expel or exclude aliens is not a criminal prosecution or proceeding. 149 U. S. 730, 13 Sup. Ct. 1016, 37 L. Ed. 905. The defendants are not on trial for the offense of coming into or being in the United States contrary to law, but the government, in the exercise of its sovereign power, is seeking to expel or exclude aliens who have no right to be here. This is not done as a punishment for coming in or being here, whether lawfully or unlawfully, but as a matter of public policy. A crime is "a wrong which the government notices as injurious to the public, and punishes in what is called a 'criminal proceeding,' in its own name." 1 Bish. Cr. Law, § 43; Kentucky v. Dennison, 24 How. 66, 16 L. Ed. 717; People v. Donohue, 84 N. Y. 441. Cent. Dict. tit. "Crime." True, congress may make it a crime for an alien to come into this country in violation of our laws, or, being herein, to remain in violation of such laws after being ordered to depart; and should this be done, and a punishment prescribed for the violation of such law, the trial would be by the judicial, and not by the executive, branch of the government, and the constitutional right of trial by jury, etc., would necessarily inure to the benefit, and operate for the protection, of the offender. Wong Wing v. U. S., 163 U. S. 228, 16 Sup. Ct. 977, 41 L. Ed. 140.

Section 4 of the act of May 5, 1892, "An act to prohibit the coming of Chinese persons into the United States," was declared unconstitutional by the supreme court of the United States, in the above-cited case, because no judicial trial according to the constitution to establish the guilt of the accused was provided, not because the power to enact a criminal statute in accordance with the constitution, and accompanied or limited by the safeguards of that instrument, does not exist. This was also declared, in substance, by Mr. Justice Gray in Fong Yue Ting v. U. S., 149 U. S. 730, 13 Sup. Ct. 1016, 37 L. Ed.

905. The decision in the Wong Wing case, supra, took from the act of May 5, 1892 (27 Stat. 25), its criminal features. The result is that in all these Chinese deportation cases the defendants may be sworn as witnesses in their own behalf. Potter v. Bank, 102 U. S. 163, 26 L. Ed. 111; Bradley v. U. S., 104 U. S. 442, 26 L. Ed. 824; Green v. U. S., 9 Wall. 655, 19 L. Ed. 806. At their own request, defendants may testify in all criminal cases. In civil cases there is no provision of law that their failure to be sworn shall neither create a presumption nor permit an inference against them. In criminal cases there is such a provision. Act March 16, 1878, c. 37 (U. S. Comp. Stat. 1901, p. 660). "And his failure to make such request shall create no presumption against him." If defendants fail to give testimony in their own behalf, and explain doubtful matters peculiarly within their own knowledge, in these deportation cases, that fact may be commented on, and used to their disadvantage, possibly, for such fact may be considered by the court or commissioner, with all the evidence and circumstances of the case, and justify him in taking testimony they might have explained or denied, strongly against them. See cases cited below. Hence the commissioners in each of these cases had the right to consider the silence of the defendants in their respective cases in that regard, and such silence or failure to deny or contradict certain statements, or even give evidence on the main issue, may have turned the scales. Such silence cannot be taken as proof of any fact, or as an admission, but it is a circumstance which may be considered in determining which of two witnesses contradicting each other has testified correctly. Quock Ting v. U. S., 140 U. S. 420, 11 Sup. Ct. 733, 851, 35 L. Ed. 501; Schwier v. Railroad Co., 90 N. Y. 564; Grinnell v. Taylor, 85 Hun, 85, 32 N. Y. Supp. 684, affirmed in 155 N. Y. 653, 49 N. E. 1097.

Said the court, per Field, J., in Quock Ting v. U. S., supra:

"It is incredible that a father would allow the exclusion of his son from the country where he lived, when proof of his son's birth and residence there for years could have been easily shown, if such in truth had been the fact."

Section 3 of the act of May 5, 1892 (27 Stat. 25), has wisely and necessarily provided (if the law is to be enforced):

"That any Chinese person or person of Chinese descent arrested under the provisions of this act or the acts hereby extended, shall be adjudged to be unlawfully within the United States unless such person shall establish by affirmative proof, to the satisfaction of such justice, judge or commissioner, his lawful right to remain in the United States."

The burden of proof, not of evidence, merely, is on the defendant. There is a wide difference between testimony and evidence, as well as between evidence and proof. There may be pages of testimony of some relevancy, without any substantial evidence of the fact sought to be established. So there may be some evidence of such fact, but no sufficient proof. Testimony is the statements given by the witnesses, and, if relevant, they are evidence. Evidence is whatever may properly be considered by the court, or properly may be submitted to the jury for its consideration, while proof is the legal effect of evidence. People v. Beckwith, 108 N. Y. 67–73, 15 N. E. 53; Steph. Dig. Ev. (2d Ed.) p. 3, note 2. See 1 Tayl. Ev., notes 2, 3, by Chamberlayne.

This statute demands proof to the satisfaction of the commissioner or judge, not the production of a mere preponderance of testimony or of evidence. Evidence may or may not be believed by the court or jury, but proof must be accepted and acted on. And the rule is well settled that in civil cases only a preponderance of credible evidence is demanded. Insurance Co. v. Ward, 140 U. S. 76–90, 11 Sup. Ct. 720, 35 L. Ed. 371; Seybolt v. Railroad Co., 95 N. Y. 562, 47 Am. Rep. 75; Taylor v. Felsing, 164 Ill. 331, 45 N. E. 161; Hall v. Wolff, 61 Iowa, 559, 16 N. W. 710; Strand v. Railway Co., 67 Mich. 380, 34 N. W. 712. But when the credible evidence on the two sides is in equipoise, the verdict or decision should be against the party having the general burden of proof on the main issue. Broult v. Hanson, 158 Mass. 17, 32 N. E. 900; Whitlatch v. Casualty Co., 149 N. Y. 45, 43 N. E. 405; Railroad Co. v. Hale, 90 Ala. 8, 8 South. 142, 24 Am. St. Rep. 748; Rogers v. Wallace, 10 Or. 387; Gage v. Railway Co., 88 Tenn. 724, 14 S. W. 73. See, also, Trust Co. v. Siefke, 144 N. Y. 354, 39 N. E. 358. In this connection it should be remembered that credible and undisputed evidence amounts to proof, and must be accepted as such. What shall be accepted as satisfactory proof is evidence that satisfies the judicial mind. The defendant is not required to satisfy the prejudiced, the capricious, the unreasonable, or the arbitrary mind; but he must satisfy the judgment of a reasonable man, acting honestly and with good judgment, and without prejudice or bias. The commissioner may not arbitrarily or capriciously, or against reasonable, unimpeached, and credible evidence, containing no element of inherent improbability, and which is uncontradicted in its material points, and susceptible of but one fair construction, refuse to be satisfied. When clearly, from the evidence, the judicial mind ought to be satisfied, in the eye of the law it is satisfied. To hold otherwise would subject the Chinese citizen to the caprice of the commissioner before whom brought. The right of a Chinese person, born in the United States under the circumstances stated, to be and remain therein, cannot be questioned or denied on any ground; assuming, of course, such right has not been forfeited by the commission of some act entailing that consequence.

The general rule is that uncontradicted evidence, free from inherent improbability, when given by disinterested witnesses, and in no way discredited, is conclusive. Quock Ting v. U. S., 140 U. S. 420, 11 Sup. Ct. 733, 851, 35 L. Ed. 501; Kavanagh v. Wilson, 70 N. Y. 177–179; Wait v. McNeil, 7 Mass. 261. See, also, numerous cases hereafter cited. The witness must be credible, and it must appear that he knows whereof he speaks. This may be shown by his own testimony in many, and probably in most, cases. It cannot be said, however, that when a statute provides, in terms, as here, that the fact must be proved to the satisfaction of the commissioner, that officer is bound, as matter of law, to be satisfied with the evidence of a single witness, a total stranger to the court and community, however fair, clear, and conclusive the statement alone may appear to be. 3 Greenl. Ev. § 377. It must be that the court is at liberty to consider the source of the testimony given, as well as its quality and amount. "Satisfactory or sufficient evidence: That amount or weight of evidence which is

adapted to convince a reasonable mind." Steph. Dig. Ev. (2d Ed.) p. 3, note 2. Com. v. Robinson, 146 Mass. 571, 16 N. E. 452; Deal v. State, 140 Ind. 354, 39 N. E. 930.

Greenleaf says (1 Greenl. Ev. § 2):

"By 'satisfactory evidence,' which is sometimes called 'sufficient evidence,' is intended that amount of proof which ordinarily satisfied an unprejudiced mind beyond reasonable doubt. The circumstances which will amount to this degree of proof can never be previously defined. The only legal test of which they are susceptible is their sufficiency to satisfy the mind and conscience of a common man; and so to convince him that he would venture to act upon that conviction in matters of the highest concern and importance to his own interest."

2 Starkie, Ev. 514.

It is not improbable that this rule was in the mind of the congress when it enacted the law under consideration.

The truth of the unsupported statements of a single witness may be tested by their inherent probability, by their clearness and their consistency with each other, by the intelligence of the witness in observing and reporting upon the facts to which he testifies, by his freedom from bias and prejudice as evidenced by words or conduct, or by his known character for honesty and truth. Cornwell v. Riker, 2 Dem. Sur. 354. If the witness be a total stranger in the community where called, and to the party against whom he gives evidence, and such evidence relates to an alleged fact of which several obtainable witnesses may and must know, but as to the existence or nonexistence of which no other person gives testimony, this circumstance alone may justify the court in refusing to find that the alleged fact has been established to its satisfaction. A presumption, or inference, rather, may arise from the nonproduction of obtainable living witnesses, having knowledge of the facts, that the fact is otherwise than as stated by the witness produced, or at least that the absent witnesses would not sustain the witness produced. Quock Ting v. U. S., 140 U. S. 420, 11 Sup. Ct. 733, 851, 35 L. Ed. 501. The result in such a case is that the asserted fact may not be proved to the satisfaction of the commissioner or court. The court or commissioner may not unreasonably demand a large amount of cumulative evidence, but it may demand, if in existence and obtainable, more than one witness on any given material point. The liability of a witness to mistakes demands this. The source whence the witness derived his knowledge, or the probability of his having been in a situation to know the fact or observe the transaction testified to, may also be considered by the court in determining the truth of the statements made in court. Same case. Evidence from a male person, not the father, that a certain person was born at a certain time and place (that being the fact in controversy) unaccompanied by any details as to how or why he knows such fact, may not be conclusive on the court. But to warrant a finding against the statement of the witness, something should appear upon the record to justify the court in refusing to give it full faith and credit. It is true that many times the appearance of a witness on the stand, his quibbling, his reluctance, his hesitation, or his zeal and apparent interest, not expressed in words, effectually discredits the witness, and

in such case the court is at liberty to refuse to find in accordance with the statements made. People v. Tuczkewitz, 149 N. Y. 251, 43 N. E. 548. In such cases the record should be made to show the facts, so far as such facts, by proper questions, may be noted on the records of the court. It is impossible to prescribe any fixed rule by which the credibility of the witness is to be tested, or which shall bind the conscience of the court as to the conclusiveness of the evidence in a given case, but ordinarily the record will disclose to the appellate tribunal the reasons why full faith and credit were not given and should not be given to the witness.

Attention is called to the following New York cases, all pertinent and more or less in point: Lomer v. Meeker, 25 N. Y. 363; Seibert v. Railroad Co., 49 Barb. 587; Conrad v. Williams, 6 Hill, 447; Stafford v. Leamy, 2 Jones & S. 269; Hull v. Littauer, 162 N. Y. 569, 57 N. E. 102; Kelly v. Burroughs, 102 N. Y. 93, 6 N. E. 109; Plyer v. Insurance Co., 121 N. Y. 691, 692, 24 N. E. 929; People v. Tuczkewitz, 149 N. Y. 240–250, 43 N. E. 548; Dwight v. Insurance Co., 103 N. Y. 341, 359, 360, 8 N. E. 654, 57 Am. Rep. 729; Elwood v. Telegraph Co., 45 N. Y. 549–553, 6 Am. Rep. 140; Koehler v. Adler, 78 N. Y. 287–291; Kavanagh v. Wilson, 70 N. Y. 177–179.

In a criminal case it is not within the power of the court to direct a verdict of guilty or not guilty, or compel the jury to find such a verdict, however clear and conclusive the evidence may be. Therefore the jury may find a verdict of guilty or not guilty arbitrarily or capriciously, and when the finding is "Not guilty" the verdict must stand. The court may, however, advise the jury to find a verdict of not guilty, and may reverse a conviction as against or unsupported by the evidence. Therefore the rule that reasonable, disinterested, credible, and uncontradicted evidence, having no element of inherent improbability, cannot be disregarded, has no application in a criminal case. The main reason for this is that in criminal trials the jury is the sole judge of the facts. Not so in civil cases. Here there is always a preliminary question for the court, viz., is there any evidence sufficient to support a verdict? Therefore decisions in criminal cases have no great weight in determining the question now before this court. People v. Tuczkewitz, 149 N. Y. 240–250, 43 N. E. 548. The decisions of the federal courts are equally clear and conclusive. Quock Ting v. U. S., 140 U. S. 417–420, 11 Sup. Ct. 733, 851, 35 L. Ed. 501; Willett v. Fister, 18 Wall. 91, 21 L. Ed. 804.

In People v. Tuczkewitz, 149 N. Y. 240, 43 N. E. 548, the trial court was requested to charge "that the jury are bound to believe the testimony of any disinterested witness which is not contradicted and which is not in itself improbable." The court declined, and the court of appeals, per Haight, J., in passing on this question, after reviewing the cases, says (no dissent on this point):

"It will be observed that the words 'unimpeached,' 'discredited,' and 'not incredible' are used in the cases, but we find no such words in the request. A witness may be discredited even when not contradicted. The examination may disclose that the witness was of bad character, a criminal and perjurer, and yet it may not be within the power of a party to contradict his testimony. His manner upon the witness stand, his halting and quibbling in answering

questions, may satisfy both the court and the jury that he is swearing falsely, and yet no witness may be in existence that could contradict his testimony. He may have told a probable story, and yet it may have been false and rendered incredible by reason of his character and manner."

In Quock Ting v. U. S., 140 U. S. 420, 11 Sup. Ct. 734, 35 L. Ed. 501, the supreme court, per Field, J., says:

"Undoubtedly, as a general rule, positive testimony as to a particular fact, uncontradicted by any one, should control the decision of the court; but that rule admits of many exceptions. There may be such an inherent improbability in the statements of a witness as to induce the court or jury to disregard his evidence, even in the absence of any direct conflicting testimony. He may be contradicted by the facts he states as completely as by direct adverse testimony, and there may be so many omissions in his account of particular transactions or of his own conduct as to discredit his whole story. His manner, too, of testifying, may give rise to doubts of his sincerity, and create the impression that he is giving a wrong coloring to material facts. All these things may properly be considered in determining the weight which should be given to his statements, although there be no adverse verbal testimony adduced."

That court cites with approval, and thus makes those cases authority here, Kavanagh v. Wilson, 70 N. Y. 177–179; Koehler v. Adler, 78 N. Y. 287; Elwood v. Telegraph Co., 45 N. Y. 549, 6 Am. Rep. 140; and Wait v. McNeil, 7 Mass. 261.

In Elwood v. Telegraph Co., supra, the court, per Rapallo, J., said:

"It is undoubtedly the general rule that where unimpeached witnesses testify distinctly and positively to a fact, and are uncontradicted, their testimony should be credited, and have the effect of overcoming a mere presumption. Newton v. Pope, 1 Cow. 110; Lomer v. Meeker, 25 N. Y. 361. But this rule is subject to many qualifications. There may be such a degree of improbability in the statements themselves as to deprive them of credit, however positively made. The witnesses, though unimpeached, may have such an interest in the question at issue as to affect their credibility. The general rules laid down in the books at a time when interest absolutely disqualified a witness necessarily assumed that the witnesses were disinterested. That qualification must, in the present state of the law, be added. And furthermore it is often a difficult question to decide when a witness is, in a legal sense, uncontradicted. He may be contradicted by circumstances as well as by statements of others contrary to his own. In such cases courts and juries are not bound to refrain from exercising their judgment, and to blindly adopt the statements of the witness for the simple reason that no other witness has denied them, and that the character of the witness is not impeached."

The court then refers to some of the evidence, and adds:

"There is also a want of distinctness in the statements of the witnesses, irrespective of any question of credibility."

In Koehler v. Adler, supra, the court cites, quotes, and approves the Elwood case.

In Kavanagh v. Wilson, 70 N. Y. 179, the court clearly states that the inherent improbabilities of the statements made, as indicated by established or known facts, are sufficient to discredit the evidence.

In Dwight v. Insurance Co., 103 N. Y. 355, 8 N. E. 654, 57 Am. Rep. 729, the failure to call certain witnesses known to have knowledge on the subject is commented on as some evidence that certain facts alleged had no existence.

In Stafford v. Leamy, 2 Jones & S. 269, it is held that a witness may impeach himself by his own contradictory or conflicting statements, or—

"By exhibiting such a want of intelligence or of memory as to incapacitate him from representing a past event so that reliance could be placed on his statement, or by giving testimony not credible on its face." Also: "Although witnesses are presumed to testify correctly, unless something appears in the case as a basis for a judgment to the contrary, yet if there appears in the case, even if it be in his own testimony only, anything which tends to the impeachment of their credibility, the finding of the jury or referee on that fact will not be disturbed, any more than a finding on any other fact."

It is true that hesitancy in giving testimony may be due to physical infirmity or to sluggish mental action; that discrepancies in giving dates or in making computations or correct figures may be due to lack of arithmetical training; that a witness may assert that a person was born at a certain place and is of a certain age, and, in giving an account of his life since such event, honestly err in computation of time, and so fill his testimony with discrepancies. But if such mistaken and erroneous statements are made under oath in a court of justice, and left uncorrected, and the court has no other evidence upon which to base a judgment, and the contradictions are on material points, the party adducing such evidence and relying solely thereon must necessarily fail, for the witness, however honest, is lacking in sufficient intelligence or memory to properly inform the court. Hence the necessity for testimony that is both truthful and intelligent. Otherwise it cannot be satisfactory to the court. An honest witness, who has sufficient memory to state but one fact connected with an important transaction, and that fact a material one, cannot be safely relied upon, as such weakness of memory not only leaves the case incomplete, but throws doubt upon the accuracy of the statement made. Such a witness may be honest, but his testimony is not reliable. Mere error of statement, if corrected by the witness, will not discredit him or seriously impair the weight of his testimony, but the statement of a witness which abounds in errors would show such a weak or confused mental condition as to justify the court in refusing judgment based thereon, even when otherwise uncontradicted; and the appellate court, in the discharge of its duty, would be called upon to reverse any decree based solely on such weak and untrustworthy testimony. Testimony given in court may be insufficient to prove an alleged fact, because of the mental incapacity of the witness, as well as because of his moral obliquity. Full weight is given the fact that certain acts in a given transaction, or happening in former years, impress and are retained by the memory more vividly than others; but the legal effect of such a transaction, made up of many acts, cannot be properly adjudicated from even a correct statement of but one, and no court should attempt to do so. A witness who goes back many years and describes one transaction, and confesses his inability to recall any other occurring within years of that time, may not be wholly reliable. Hence when a party comes into court with but one witness, and that witness attempts and purports to correctly state an event occurring at a given time, and at a place where he had resided for a long time, and with

which place he was familiar, but is unable to give any description of the locality, or to state any other transaction occurring at about the same time, the court is fully justified in refusing to be satisfied that the transaction described occurred as stated. A memory so weak and nonretentive cannot be said to satisfy the judicial mind to a degree that compels reliance thereon. These conclusions are fully justified by the remarks of Mr. Justice Field in Quock Ting v. U. S., 140 U. S. 419, 420, 11 Sup. Ct. 734, 35 L. Ed. 501, viz.:

"The testimony given by himself amounted to very little. Indeed, it was of no force or weight whatever. The particularity and positiveness with which he stated the place of his birth in San Francisco was evidently the result of instruction for his examination on this proceeding, and not a statement of what he had learned from his parents in years past. And his failure to mention any particulars as to the city of San Francisco, which he certainly ought to have been able to do if he resided there during the first ten years of his life, was surprising. A boy of any intelligence, arriving at that age, would remember, even after the lapse of six years, some words of the language of the country, some names of streets or places, or some circumstances that would satisfy one that he had been in the city before. But there was nothing whatever of this kind shown. He gave the name of no person he had seen; he described no locality or incident relating to his life in the city, nor did he repeat a single word of the language, which he must have heard during the greater part of several years, if he was there."

Such want of memory, whether in fact attributable to ignorance of the whole matter, to an unwillingness to testify, or to an inability to remember, justifies the court in refusing its assent to the statement made, for the reasons stated, and for the further reason that many times the court is unable to determine whether the witness is mentally or morally unreliable. It is all-sufficient, in legal contemplation, that the evidence is unsatisfactory and insufficient, and the court is not called upon to determine whether the witness testifies falsely, or is mentally incapable of giving correct testimony. In either event the result is the same,—the case is not proved. In Pennsylvania it is expressly held that the accuracy of the witness is always material. Derk v. Railroad Co., 164 Pa. 243, 30 Atl. 231.

There is some apparent conflict in the cases whether mere interest in the result is sufficient to justify the court or jury in finding against the evidence of the witness, when uncontradicted or otherwise unimpeached, and his testimony is clear, reasonable, and inherently probable. In Honegger v. Wettstein, 94 N. Y. 261, mere interest of the witness was held sufficient to send the question of the credibility of the witness to the jury, and justify a finding either way. There are other cases to the same effect. See cases cited in Munoz v. Wilson, 111 N. Y. 300, 18 N. E. 855. In Hull v. Littauer, 162 N. Y. 569, 57 N. E. 102, the court held:

"The rule that the credibility of a witness who is a party to the actions must be submitted to the jury is not an absolute and inflexible one, and where his evidence is not contradicted by direct evidence, nor by any legitimate inferences from the evidence, and is not improbable, nor in its nature surprising or suspicious, there is no reason for denying to it conclusiveness."

See, also, Kelly v. Burroughs, 102 N. Y. 93, 6 N. E. 109.

May not the evidence of a party be as effectually contradicted by indirect evidence or circumstances as by direct evidence?

In Kavanagh v. Wilson, 70 N. Y. 177, the witness, while not a party, was pecuniarily interested in the result, and "other circumstances rendered the statement of the witness not entirely free from improbability."

This court cannot assent to the proposition that in one of these cases a witness for the person sought to be deported is interested merely because he is a Chinese person. Such a rule would make most witnesses in a court of justice interested witnesses, and, if interest alone justifies the court in refusing credence to the testimony of a witness, then many in every trial would be more or less discredited by reason of mere national kinship, and the court or jury, as the case might be, would be at liberty to refuse to be bound by their testimony when testifying in favor of a party of their own nationality. There is no rule of law that justifies the assumption that a Chinese person is more interested in his countrymen than is a person of some other nationality in his. A Yankee may testify for a Yankee, but he is not therefore interested. An Irishman may testify for an Irishman, an Englishman for an Englishman, a German for a German; but such witnesses are not, in the eye of the law, interested. No discredit can legally attach to the testimony of a person because he gives his evidence in behalf of a party belonging to his own nationality. A Chinese witness in one of these cases, if engaged in securing the entrance of Chinese persons into the United States, is open to suspicion; and if he is engaged in aiding the entrance of such a person, and gives evidence in that behalf, he is interested, and such fact legitimately tends to discredit his testimony. We are all brothers in the family of Adam,—all brothers in the national family to which by birth or adoption we belong,—but these ties of race or color do not make us interested witnesses when we testify in court, within the rule that permits interest to be used as a discrediting circumstance. If it affirmatively appears that a witness has a bias in favor of persons of his own nationality, in whose behalf he is testifying, or against the other party to the litigation, or a bias in favor of persons of his own nationality generally, or against those of another nationality, such fact may be used to discredit his testimony. Such facts may be considered by the court and jury, but we cannot assume or presume the existence of such a bias either in favor of persons of the same nationality, or against persons of another nationality. The one assumption is as unjust and ill-founded as the other. It is quite true, however, that the testimony of foreigners and of others who are brought from a distance to the place of trial requires to be scrutinized with more than common caution. The tribunal before which they speak knows little of them, and they care little for it, and may have no respect for the laws of the country in which they are giving evidence. They have little to fear from having their falsehoods exposed, as there is little danger of conviction of perjury, and they lose nothing in reputation among their fellows. In our courts a witness who does not understand or who cannot speak our language, but who speaks through an interpreter, if at all, has the time and opportunity to prepare his

answers to each question with care, and hence the force of a cross-examination is broken, if not destroyed. So, too, it is common knowledge that enslaved peoples develop an inordinate propensity for lying, and this is characteristic of most oriental nations. This comes largely from their being subject to the caprice and exactions of their masters or superiors, and, having no sense of moral responsibility to them, they come to regard lying to them as no sin, and an habitual disregard of the truth is thus engendered. See 1 Tayl. Ev. (Ed. 1897, Am. Notes) §§ 53, 56. See, also, Chae Chan Ping v. U. S., 130 U. S., 598, 9 Sup. Ct. 623, 32 L. Ed. 1068, and 149 U. S., 730, 13 Sup. Ct. 1016, 37 L. Ed. 905. Hence in all these Chinese exclusion cases the testimony of Chinese witnesses, unknown and coming from a distance, —especially that of foreigners,—may be regarded as more or less weak; and, when contradicted or really impeached in any of the modes suggested and recognized by our law, the commissioner is justified in regarding such testimony, standing alone, as insufficient to convince the judicial mind. This conclusion must not be reached arbitrarily or capriciously or from prejudice, but from conviction that the case is not made out; and in such cases the appellate court or judge is not justified in reversing the finding of the tribunal which had the opportunity of observing the witness, and noting his manner and sincerity or want of sincerity in giving testimony. It is true that an intelligent and experienced judge often detects the falsehood of a witness who tells a story which, reduced to writing, reads smooth as the Psalms of David. The rule is now settled in England, the state of New York, and in the courts of the United States, that the evidence must be of "such a character" as to support a finding in favor of the party introducing it, and upon whom the burden of proof rests. A mere scintilla of evidence no longer suffices. Commissioners v. Clark, 94 U. S., 284, 24 L. Ed. 59; Pleasants v. Fant, 22 Wall. 116, 22 L. Ed. 780; Ryder v. Wombwell, L. R. 4 Exch. 39. It follows that "some evidence," merely, unless it be in a legal sense satisfactory and convincing to the ordinary mind, when uncontradicted and unimpeached, fails to establish the case so as to demand or justify a judgment in favor of the party introducing it. The testimony contained in these records, respectively, is either contradicted by evidence of equal or greater weight, inherently improbable, or so weak, unsatisfactory, and contradictory as to fail to establish the right of the defendants to remain in the United States.

A full and careful examination and consideration of all the evidence in each of the cases now before the court fails to disclose any ground of reversal in either case, and hence the judgments of deportation must be affirmed.